# STATE OF CONNECTICUT *v.* JUAN A. G.-P.*
## (SC 20164)

Robinson, C. J., and McDonald, D'Auria, Mullins,
Ecker, Alexander and Keller, Js.

*Syllabus*

Convicted of aggravated sexual assault of a minor and risk of injury to a child in connection with his alleged sexual abuse of his stepdaughter, J, and stepniece, B, and his alleged conduct in showing them pornographic videos on an iPad, the defendant appealed to this court. Following the disclosure of the sexual abuse, J and B were interviewed by a child forensic interviewer and physically examined by a pediatrician. The physical examinations revealed no signs of sexual abuse. Prior to trial, the defendant sought the disclosure of J's and B's psychiatric records and filed a motion seeking an in camera review. During a hearing on the defendant's motion, the guardian ad litem for J and B indicated that she had reviewed the records, that she was not opposed to the court's reviewing them, and that J's records predated the disclosures of the sexual abuse by nearly three years, whereas B's records were more recent. At trial, C and D, who are sisters and the mothers of J and B, respectively, testified for the state. The defense requested permission to cross-examine C and D about their applications for U visas, which

---

* In accordance with our policy of protecting the privacy interests of the victims of sexual abuse and the crime of risk of injury to a child, we decline to use the defendant's full name or to identify the victims or others through whom the victims' identities may be ascertained. See General Statutes § 54-86e.

Moreover, in accordance with federal law; see 18 U.S.C. § 2265 (d) (3) (2018), as amended by the Violence Against Women Act Reauthorization Act of 2022, Pub. L. No. 117-103, § 106, 136 Stat. 49, 851; we decline to identify any person protected or sought to be protected under a protection order, protective order, or a restraining order that was issued or applied for, or others through whom that person's identity may be ascertained.

allow eligible, undocumented immigrants who are the victims of a crime to lawfully remain in the United States if they assist in the investigation and prosecution of the crime. Defense counsel specifically sought to use this information to show that both witnesses had a personal interest in the outcome of the case. After a proffer outside the presence of the jury, during which defense counsel questioned C and D, the trial court denied the request, concluding that counsel had failed to establish a nexus between the U visa applications and any possible interest that C and D might have had in the outcome of the case. The court reasoned that the proffered testimony was irrelevant insofar as it credited C's and D's testimony that they were unaware of the U visa program prior to J's and B's disclosures, and, therefore, their desire to obtain U visas could not have motivated them to report the abuse or to fabricate their testimony. After the state rested its case, the trial court informed the parties that it had found no exculpatory evidence in either J's or B's psychiatric records upon its review of those records and, therefore, determined that the records were not subject to disclosure. On appeal from the judgment of conviction, the defendant claimed that the trial court had violated his federal constitutional right to confrontation by not ordering the disclosure of J's and B's psychiatric records to the defense and requested that this court conduct an independent review of those records to determine whether the trial court had correctly determined that they contained no exculpatory or relevant impeachment material. The defendant further claimed that the trial court had violated his right to confrontation by preventing defense counsel from cross-examining C and D about their U visa applications and raised two unpreserved claims of instructional error. *Held*:

1. After reviewing J's and B's psychiatric records, this court concluded that the trial court improperly failed to order that the exculpatory and relevant impeachment material contained therein be turned over to the defense, and, because this court could not conclude that that error was harmless beyond a reasonable doubt, it reversed the trial court's judgment and remanded the case for a new trial:

   a. The information in J's and B's psychiatric records was probative of their ability to know and relate the truth concerning the events in question:

   The information in J's psychiatric records related to behavioral, cognitive, and emotional issues, which could have could have affected J's ability to observe, understand, and accurately narrate the events in question, and indicated the existence of a conflict between J and C regarding each other's reporting of the events, and the information in B's psychiatric records concerned mental health and behavioral issues, as well as a history of untruthfulness.

   Moreover, because J's psychiatric records predated the disclosures of sexual abuse by nearly three years and, thus, included a period of time

State *v.* Juan A. G.-P.

during which the alleged abuse was occurring but had not yet been disclosed, any information or lack thereof pertaining to the defendant during that time period was necessarily relevant insofar as it may have served to elucidate the victims' relationship with the defendant prior to the disclosures.

Furthermore, even inculpatory material contained in psychiatric records was relevant information and should have been turned over to the defense because such information may have differed from the evidence presented at trial or may have been inconsistent with the victims' other statements, thereby calling into question the reliability of the state's version of events.

b. The trial court's failure to order the disclosure of exculpatory and relevant impeachment material contained in J's and B's psychiatric records was not harmless error:

The defense was denied access to information that was compiled by trained professionals and was relevant to and probative of J's and B's ability to know and relate the truth in a case that depended on the credibility and reliability of their version of events, and J's and B's testimony was extremely important to the outcome of the case, as it was not cumulative of other evidence, there was no physical evidence of abuse, and there was an absence of corroborating evidence because C apparently inadvertently erased the data from the family's iPad following the disclosures.

Although the forensic interviews of J and B provided the strongest evidence in the state's case, this court disagreed with the state's argument that those interviews presented consistent, detailed accounts of the relevant events and, therefore, constituted compelling evidence of the defendant's guilt, as the answers that each child gave to the interviewer's questions were generally vague and nonresponsive, and this court was not persuaded with the state's argument that J and B provided idiosyncratic details that strongly indicated that they were sexually abused by the defendant.

2. The trial court violated the defendant's right to confrontation by precluding defense counsel from questioning C and D about their U visa applications and thereby preventing him from exposing the jury to prototypical impeachment evidence showing that a witness or witnesses were promised or stood to gain some type of benefit from the state in return for their cooperation:

The U visa status carries with it important benefits to immigrants, including protections against deportation and work authorization, U visas are awarded only if the applicant has been, is being, or is likely to be helpful to a government agency investigating or prosecuting criminal activity, and that duty to remain helpful to law enforcement personnel is an ongoing responsibility that exists even after a U visa has been granted.

346 Conn. 132 FEBRUARY, 2023 135

State *v.* Juan A. G.-P.

In the present case, the trial court took an overly narrow view with respect to the relevance of C's and D's testimony about the status of their U visa applications because, to lay a foundation for the admission of impeachment evidence, the defendant was required to show only that the U visa evidence was relevant to C's and D's motive to testify in a certain manner, and, even if the jurors believed C's and D's testimony that they did not learn about the U visa program until after discovering the sexual abuse, that would not render the U visa evidence irrelevant, insofar as the structure of the U visa program and its requirement that the applicant be helpful to law enforcement personnel could create an incentive to a witness hoping to have his or her visa granted.

Moreover, this court previously has concluded that a witness' immigration status is a relevant subject of inquiry when there is a demonstrated link between it and the witness' bias, interest, or motive for testifying, and it agreed with the reasoning of other courts that have considered the admissibility of evidence of U visas and have held that a witness' efforts to obtain one is necessarily relevant to the jurors' assessment of the witness' bias, interest, or motive for testifying.

Because this court determined that the defendant was entitled to a new trial on the basis of the trial court's failure to disclose relevant portions of J's and B's psychiatric records, a harmless error analysis in connection with the U visa claim was not necessary.

3. This court directed trial courts to refrain from instructing jurors, as the trial court did in this case, that, when the evidence is subject to two possible interpretations, jurors are not required to accept the interpretation consistent with innocence or to accept the interpretation that is consistent with guilt:

Such an instruction could potentially mislead or confuse jurors with respect to the state's burden of proof because it introduces into the jurors' deliberations a standard of proof at odds with the beyond a reasonable doubt standard applicable to the charged offenses and is inconsistent with the principle that, if jurors can, in reason, reconcile all of the facts proven with any reasonable theory consistent with the innocence of the accused, then they cannot find the defendant guilty.

Moreover, with respect to subsidiary facts that are not subject to the beyond a reasonable doubt standard, it is sufficient for the trial court simply to instruct the jurors that they may find such facts proven if it is reasonable and logical to do so.

4. This court strongly recommend that, in cases involving multiple charges, multiple victims, or both, trial courts instruct jurors, in accordance with instruction 2.6-11 of Connecticut's model criminal jury instructions, that the jurors must consider each count separately and return a separate verdict for each count, and that a verdict reached on one count does

State *v.* Juan A. G.-P.

not bind their decision on another count, and the trial court should so instruct jurors regardless of whether the court is asked to do so.

Argued September 14, 2022—officially released February 6, 2023**

*Procedural History*

Substitute information charging the defendant with two counts of the crime of aggravated sexual assault of a minor and four counts of the crime of risk of injury to a child, brought to the Superior Court in the judicial district of Danbury and tried to the jury before *Russo, J.*; verdict of guilty; thereafter, the court vacated the conviction as to two counts of risk of injury to a child and rendered judgment thereon, from which the defendant appealed to this court. *Reversed; new trial.*

*Pamela S. Nagy*, supervisory assistant public defender, for the appellant (defendant).

*Laurie N. Feldman*, assistant state's attorney, with whom were *Sharmese Walcott*, state's attorney, and, on the brief, *Stephen J. Sedensky III*, former state's attorney, and *Matthew A. Weiner*, former assistant state's attorney, for the appellee (state).

*Opinion*

ALEXANDER, J. Following a jury trial, the defendant, Juan A. G.-P., was convicted of two counts of aggravated sexual assault of a minor in violation of General Statutes § 53a-70c (a) (5) and two counts of risk of injury to a child in violation of General Statutes § 53-21 (a) (1).[1] On appeal,[2] the defendant claims that the trial court violated his right to confrontation under the sixth

---

** February 6, 2023, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] The defendant also was found guilty of two counts of risk of injury to a child in violation of § 53-21 (a) (2). At sentencing, the trial court vacated these convictions, as they were lesser included offenses of the two counts of aggravated sexual assault of a minor.

[2] The defendant appealed directly to this court pursuant to General Statutes § 51-199 (b) (3).

State *v.* Juan A. G.-P.

amendment to the United States constitution[3] by not ordering disclosure of the victims' psychiatric records to the defense. The defendant asks this court to conduct an independent review of those records to determine whether they contain exculpatory or relevant impeachment material. The defendant further claims that the trial court violated his confrontation rights by preventing him from questioning the victims' mothers about their U visa applications.[4] Lastly, the defendant raises two unpreserved claims of instructional error. Specifically, he claims that the trial court improperly (1) instructed the jury that, if the evidence was subject to two different interpretations, the jury was "not required to accept the interpretation consistent with innocence," and (2) failed to instruct the jury, in accordance with instruction 2.6-11 of Connecticut's model criminal jury instructions, that it must consider each count separately and that a verdict reached on one count does not control the verdict on any other count.

We conclude that the trial court improperly failed to order that exculpatory and relevant impeachment material contained in the victims' psychiatric records be turned over to the defense. Because we cannot conclude that this error was harmless beyond a reasonable doubt, we reverse the judgment of conviction and remand the case for a new trial. We also address the defendant's remaining confrontation clause claim because it is likely to arise again at a new trial and conclude that the trial court improperly precluded cross-exam-

[3] The right to confrontation guaranteed by the sixth amendment is made applicable to the states through the due process clause of the fourteenth amendment. See, e.g., *Pointer* v. *Texas*, 380 U.S. 400, 403, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965).

[4] As we explain more fully in part II of this opinion, a U visa allows eligible undocumented immigrants who are victims of crime, and their qualifying family members, to lawfully remain in the United States if they assist in the investigation and prosecution of the perpetrator of that crime. See 8 U.S.C. § 1101 (a) (15) (U) (i) (2018).

State *v.* Juan A. G.-P.

ination of the victims' mothers concerning their U visa applications. Finally, we agree with the defendant's claims of instructional error.

The following facts, which the jury reasonably could have found, and procedural history are relevant to our resolution of this appeal. C and D, who are sisters, emigrated to the United States from Brazil in 2004. Thereafter, C gave birth to two daughters, J and S, and D gave birth to one daughter, B. C and the defendant began dating in 2011. In 2012, they moved in together, and, in 2013, they married and had a son.

On the evening of February 11, 2015, B was spending the night at C's house. J was then nine years old, B was about to turn nine, and S was six years old. At around 3 a.m., C went into the girls' bedroom to check on them.[5] She noticed that all three girls were sleeping in the same bed and that the clothes they were wearing were different from the ones they had worn to bed. Suspicious, C pulled back the covers and discovered that B's pajama bottoms were pulled down to her knees. "[S]hocked" by what she saw, C shook the girls awake and instructed B to pull her pajama bottoms up. She then returned to her bedroom and woke the defendant, asking him "if he had anything that he needed to tell [her]." The defendant asked her "why [she] was asking him that . . . ." C replied, "because I went to the girls' bedroom, and [B] had her pajama bottoms around her knees . . . ." The defendant responded, "well, you should ask her about that" and "went back to sleep . . . ." Too upset to sleep, C "spent the rest of the [early] morning thinking about what might have happened."

At around 7:30 a.m., C confronted the girls and demanded that they tell her why B's pajama bottoms

[5] The facts and circumstances pertaining to the victims' initial disclosures of sexual abuse are taken directly from C's trial testimony, which was admitted into evidence pursuant to the tender years exception to the hearsay rule. See Conn. Code Evid. § 8-10.

State *v.* Juan A. G.-P.

had been around her knees. B responded, "oh . . . we were playing with this bear." C asked them where they "learn[ed] to play like that" with the bear, stating that "something strange [was] happening" and that she needed to know immediately where they learned to play like that. C could see that the girls were "getting nervous," so she told them that, if they did not answer her, she would "call the police because something [was] very strange." At this point, J "started shaking, saying, no, no." B then turned to J and said, "tell her," and J responded, "it's [the defendant]. He shows us videos on the iPad."[6]

By then, C "was getting very upset" and took J to another room to talk privately with her. There, she asked J about the videos and whether the defendant had done to her "what [she] saw in the videos . . . ." When J answered, "yes," C told her that she was going to call the police. Both J and B shouted for her not to do so, but C insisted.

The defendant woke up before the police arrived, unaware of what was happening. When he came out of his bedroom, he asked C whether she had received an answer from B about why her pajama bottoms were down. C responded that B "didn't tell [her] anything." The defendant told C that she was acting "strange" and went to prepare a bottle for their son.

Danbury Police Officer Jonathan Contreras arrived at the house a short time later. The first thing he did was gather everyone in the living room. Because C does not speak English, she instructed J to tell Contreras what had happened. J informed him that the defendant had sexually abused her and B. Until that moment, J had not mentioned that B had also been abused. When

---

[6] Evidence adduced at trial indicated that the iPad in question was registered to C but used by the entire family and referred to within the family as S's iPad because S's father had paid for it.

State *v.* Juan A. G.-P.

J finished speaking, the defendant appeared "confused" and asked J, "love, why would you say that? Why . . . would you lie?" Given the nature of the complaint, police protocol required Contreras to summon a detective from the police department's special victims unit. He then separated the defendant from the rest of the family and waited for the detective to arrive. When Detective Kevin Zaloski arrived, the defendant was permitted to gather his belongings and to leave. The defendant never returned to the family home.

A week after J's disclosure, J and B were interviewed separately by Donna Meyer, a child forensic interviewer and consultant to the multidisciplinary investigation team assigned to investigate J's accusations. Video recordings of the interviews were entered into evidence at the defendant's trial and played for the jury. Transcripts of the interviews were also entered into evidence. During the interviews, Meyer gave the girls drawings of a naked male and a naked female for them to indicate where on their bodies the defendant had touched them.

During J's interview, Meyer asked J, "[s]o, what did you come here to talk to me about today?" J asked Meyer whether she was referring to "what happened at [her] house . . . ." J then stated, "um, [the police] . . . came to my house . . . one day because, um, because . . . my mom woke up . . . and found that . . . [B's] pants were down. . . . But I didn't . . . so, um . . . I told her a story . . . but it's actually true." Meyer asked J what story she had told her mother, and J responded that one day, while her mother was at the store, the defendant "grabbed [her] on the hips and . . . put [her] on [her mother's] bed . . . ." Meyer then reassured J that she was "doing a good job," and J continued, "he . . . took out his thing . . . [b]ut, so then he did it and then um, I ran away to my room because I didn't want to see him anymore. . . . And then he said for me . . . to not tell my mom." Meyer

State *v.* Juan A. G.-P.

asked J whether "this thing that happened with [the defendant happened] one time or more than one time . . . ." J responded, "[m]ore." Meyer later asked J, "what was the first thing [the defendant did] when he brought you to your mom's room?" J answered, "[h]e stuck his thing out."

Meyer continued, "so he took his thing out and then what was the next thing he did?" J replied, "he didn't put it on me but like, he put it like on my pants . . . [but] I got away, so then, um, um, I ran away like, to my bedroom." Meyer responded, "before you got away, did [the defendant] ever make you touch his thing or do [something] to his thing? Did he ever do anything to his thing?" J replied, "[n]o." When Meyer responded, "[n]o? OK," J stated, [o]h! Yea, yea, yea, he would get his saliva like this and then put it on . . . [h]is thing. . . . And he said it felt good . . . and he said it . . . would be hard so, but sometimes . . . he told me secrets but and then he told me something if like if I was telling secrets with him, but I said yes, but actually I was lying." Meyer later asked J to tell her more about the time "when [the defendant] put the saliva on [his thing] . . . ." J responded, "I don't think he did it. . . . He told me [about it]. He said he does it in the bathroom, I think." Meyer asked J whether the defendant had ever made or wanted her "to do that to him," and J responded, "[n]ope." When Meyer replied, "[n]o? OK," J stated, "[o]h yea! He said for me like, to touch his thing. . . . But I didn't want to . . . so I didn't." Meyer then continued, "OK. Was there ever a time that he made you touch it?" J responded, "[n]ope." When Meyer said, "[n]o? OK," J stated, "he said for me to . . . touch his thing, but, um, but I didn't. I said no."

When asked to describe "a time that something happened in the living room," J responded, "like, me and [B] . . . were . . . at my house . . . [a]nd then my mom and my sister went to take a bath . . . so then,

State *v.* Juan A. G.-P.

um, [the defendant] called us and said come here, so he stuck his thing on us.'' When asked to indicate where he stuck his thing, J responded, ''on the back and on the front [indicating her vagina and buttocks].'' J continued, ''he did it once with [B] and then me and . . . then he did it like in my baby brother's room . . . [but] when my mom was about to get out . . . of the bathroom, um, he said for us to watch TV or else my mom would figure out . . . so we did but like . . . there was a movie that we liked, so we wanted to finish it, so then, um, and he would show us to, um, um, um, one boy and two girls or one [girl] doing the thing together.'' Meyer then asked J, ''where would he show you that stuff?'' J responded that he had shown it to them on the family's iPad.

Meyer also asked J whether the defendant had ever wanted her ''to do the things that were in the videos . . . .'' J responded, ''[h]e said let's do the thing in the video[s], but I didn't want to and, um, so one day he did it, but sometimes . . . he would call me, but sometimes I said no and sometimes I said yes and . . . sometimes I just went so uh, um, I didn't like, actually say yes, but I just went so then, um, so then he, he, he . . . he got me in my mom's bed . . . and one time he just grabbed me and put it in here [indicating her vagina], and, when I tried to get out, he would hold me and not let me get out.'' Meyer asked J whether the defendant had ''ever put his [thing] inside part of [her] body . . . .'' J responded, ''[h]e put [it] like, um, here and right there [indicating her vagina and buttocks].'' When asked, ''how did that feel,'' J responded, ''[b]ad.''

Meyer began her interview of B by asking her whether ''something happened recently . . . .'' B responded, ''I don't remember, I think it was last week um, um . . . I was sleeping at [J's] and, in the morning, [J's] mom asked us a question and then, um, we told her it, and, um, she had to . . . call the police, and they did that,

State *v.* Juan A. G.-P.

then, um, the police came, and she called the school and said we weren't going to school . . . and . . . well the reason she called was because [the defendant], um, touched me and her and, um, yeah, and that was pretty much it." When asked whether she could remember the last time the defendant touched her, B responded, "[n]o, not really." When asked if she remembered the first time, B responded, "like, maybe, yeah, I don't remember." Meyer asked B where she was the first time it happened. B replied that she was in J's baby brother's bedroom. When asked what the defendant did to her, B responded, "first, he did it to [J]." When asked what that was, B replied, "[l]ike he put his thing in her um hands . . . and then [started] shaking her."

Meyer then asked her, "after he did that to [J], then what happened?" B replied, "[t]hen he did it to me, but he did it the exact same way." When asked whether she saw the defendant's "thing," B replied that she had not seen it because her eyes were closed. Meyer asked B, "what did he do with his thing . . . did he put it on your skin, your clothes or something else?" B responded that he put it on her skin, pointing to her vagina and buttocks. With respect to her vagina, Meyer asked B whether the defendant put it "on the inside, on the outside, or something else . . . ." B replied, "[i]nside." When asked how it felt, B stated, "[i]t felt bad . . . [a]nd it hurt a little." Meyer then asked B whether, when he put his thing on her buttocks, "he put [it] . . . on the inside, the outside, or something else . . . ." B replied, "[i]nside." When asked how it felt, B stated that it "hurt a little more."

When asked about the second instance of abuse, B stated that the defendant "took out his thing and . . . put it in [J] . . . [while] J was standing up on [a] chair," and, when he was done, "he did the exact same thing [to her]." When asked to describe exactly what the defendant had done, B stated that "he put his thing in

State *v.* Juan A. G.-P.

our pants inside us and then he started shaking us like, um, the same . . . in the [bed]room.''

Following the forensic interviews, J and B were referred to Veronica Ron-Priola, a pediatrician at Danbury Hospital and the medical consultant for the multidisciplinary investigation team investigating J's and B's allegations. Ron-Priola examined both girls and determined that there were no physical signs of sexual abuse. In her reports, which were entered into evidence at the defendant's trial, Ron-Priola noted a ''small area of fusion'' on J's labia minora, which she characterized as a normal variant. During the interview portion of J's examination, J informed Ron-Priola that the defendant had put his penis inside her vagina and anus ''many, many times.''

Ron-Priola asked each girl a series of questions during the examinations, including whether they had ever seen blood in their underpants after the defendant abused them, whether it ever hurt to go to the bathroom after, and whether they ever saw or felt anything wet come out of the defendant's penis. Both girls answered no to each question. She also asked them whether they ever experienced pain when the defendant put his penis in them. J replied, ''it hurt a little in my front and my butt.'' B replied, ''[y]es, a little.'' Ron-Priola noted in both reports that a normal physical examination does not confirm or negate child sexual abuse and that the girls' oral histories were consistent with having been abused.

Approximately one week after the sexual abuse was reported, Zaloski asked C to bring the family's iPad to the police station so it could be forensically examined. When C arrived, she informed Zaloski that she inadvertently had reset the device while attempting to remove an application from her iPhone. C stated that she had wanted to remove the application because she feared

State *v.* Juan A. G.-P.

that the defendant could use it to locate her. Officer David Antedomenico, a member of the crime scene unit of the Danbury Police Department, examined the iPad and determined, consistent with C's statements, that the device had been reset. He further determined that any evidence the device may have contained was lost as a result. Because the iPad was perceived to be of no evidentiary value, Zaloski returned it to C at that time.

The defendant was subsequently arrested and charged with two counts of aggravated sexual assault of a minor in violation of § 53a-70c (a) (5),[7] two counts of risk of injury to a child in violation of § 53-21 (a) (1) based on the defendant's "showing adult videos" to J and B and "telling [them] to simulate the behavior [seen in the videos] and to keep the incidents a secret," and two counts of risk of injury to a child in violation of § 53-21 (a) (2).[8]

J and B were twelve years old at the time of the defendant's trial. On direct examination, J testified that she was seven or eight years old when the defendant sexually abused her for the first time. When asked if she could "tell the jury about a time that this happened when [B] was there," J responded: "Well, um . . . he took me and [B] to the [corner of the] living room . . . when my mom and my sister were taking a shower . . . . He pulled our pants down and then started to abuse us." When asked to describe what he did, J

---

[7] General Statutes § 53a-70c (a) provides in relevant part: "A person is guilty of aggravated sexual assault of a minor when such person commits a violation of subdivision (2) of subsection (a) of section 53-21 . . . and the victim of such offense is under thirteen years of age, and . . . (5) there was more than one victim of such offense under thirteen years of age . . . ."

[8] General Statutes § 53-21 (a) provides in relevant part: "Any person who . . . (2) has contact with the intimate parts . . . of a child under the age of sixteen years or subjects a child under sixteen years of age to contact with the intimate parts of such person, in a sexual and indecent manner likely to impair the health or morals of such child . . . shall be guilty of . . . a class B felony . . . ."

State *v.* Juan A. G.-P.

replied, "[h]e put his penis in my behind and on my vagina." When asked, "did anything happen to [B]," J replied, "[h]e did the same thing to her." J was also asked whether the defendant "ever show[ed] [her] things . . . ." She replied that he showed her videos of people having sex. When asked why she did not tell her mother about the abuse when it started, J replied, "[bec]ause [the defendant] told me not to tell her." When asked whether the defendant told her why she should not tell her mother, J responded, "[h]e said that . . . he would tell her that it was all a lie and that she wouldn't believe me." During cross-examination, J testified that she sometimes used her family's iPad to search the Internet on her own. She also testified that she had not seen the defendant or spoken to him since the day she reported the abuse.

B testified that the defendant abused her on two occasions, once in J's baby brother's bedroom and once in the dining room. When asked to describe what happened in the bedroom, B stated, "[the defendant] would tell us to go in the room, and then he would put his thing in our pants and . . . would, like, since we were little, he would, like, shake us up and down." When asked to "describe for the jury how it felt," B responded, "[i]t didn't feel very good, it felt weird." When asked what she meant by "weird," B stated, "[i]t felt weird because it, like, his thing went inside of [me]." When asked whether it hurt "a lot, a little, or something else," B responded, "[i]t hurt . . . a little bit more than a little bit, but it didn't hurt that much." B was also asked whether the defendant "ever . . . show[ed] [her] what he wanted [her] to do . . . ." B responded, "I remember him getting an iPad and showing us things. I just don't remember the videos."

B was then asked about the time the defendant abused her in the dining room. B responded, "he would tell us to stand on a chair because we were small, and

State *v.* Juan A. G.-P.

then he would put his thing inside our pants and then shake us up and down." The questioning continued as follows:

   "[The Prosecutor]: And he would have you, you said . . . stand on a chair?

   "[B]: Well, he would have [J] stand on a chair, and I would stand on my knees because I was very tall.

   "[The Prosecutor]: And I . . . just want to make sure I heard you say, you said you would stand on your knees?

   "[B]: Yes. . . .

   "[The Prosecutor]: You're taller than [J]?

   "[B]: Yes.

   "[The Prosecutor]: So, I just want to make sure I heard you [correctly], [J] would stand on a chair, and you would kneel on the chair?

   "[B]: Yes.

   "[The Prosecutor]: Okay. And when this happened— so if [J's] standing on the chair, where were you? . . .

   "[B]: Well . . . we would get scared, so we would hold each other's hands.

   "[The Prosecutor]: Okay. So, you were right there next to her?

   "[B]: Yes.

   "[The Prosecutor]: And then when you were kneeling on the chair, where was [J]?

   "[B]: She was holding my hand.

   "[The Prosecutor]: And where was [C] when this happened?

State *v.* Juan A. G.-P.

"[B]: She . . . would be out of the house or, sometimes, she would be, like, taking a shower."

Ron-Priola also testified at the defendant's trial. During her testimony, she emphasized that, although J's and B's physical examinations revealed no signs of sexual abuse, "[a] normal physical exam . . . does not mean that nothing happened. You can have a child that's been abused and the physical exam is going to be normal most of the time." During cross-examination, Ron-Priola confirmed that J's hymen was nonestrogenized at the time of the abuse, meaning that "her hymen was thinner" and typically would have been "very sensitive . . . to pain" and "more sensitive to injury, if there [had been] . . . an assault of some kind . . . ." She also confirmed that B "had a very small opening through the hymen" and that there were no transections in the hymen of either girl. Ron-Priola stated that, "if there [had been transections in their hymens] that would indicate . . . forceful penetration into the vagina." When asked "under what circumstances would you expect to see scarring," Ron-Priola replied, "usually, we see that in girls that have not reached puberty, when there is forceful penetration into the vagina, there will be cuts through the hymen, and those are . . . transections, and usually we can see that."

During cross-examination of C, defense counsel asked her whether the defendant ever returned to the family home after February 12, 2015. C replied, "[n]ot that I know of." He also asked her why she had erased the family's iPad immediately following J's disclosures. C answered that she had done it inadvertently while attempting to reset her iPhone. When asked whether she ever used the iPad after the police returned it to her in 2015, she replied, "[n]o. No, it didn't work nothing. . . . I didn't use it for anything nor my children."

D testified that, on the morning of February 12, 2015, C called and told her to come right over but did not

State *v.* Juan A. G.-P.

tell her why. When asked to describe her reaction when she learned of the defendant's conduct, D replied, "I was very shocked because I thought that it would be anything else. I thought someone had broken into the home, burglarized the home, [or] robbed the home. I never thought that [the defendant] was capable of something like that." During cross-examination, defense counsel asked D how often B slept at J's house prior to the disclosures. She responded, "once or twice a week . . . ." When asked whether B had ever resisted going to J's house before the disclosures, or whether B ever appeared frightened to go there, D responded, "[B] was always happy and comfortable going over to that house, and [J] would always ask her to come over."

After the state rested its case, the defendant moved for a judgment of acquittal, and the court denied the motion. The defense then presented its case, starting with the testimony of Anthony Coppola, a recently retired emergency medicine physician from Yale New Haven Hospital with experience treating child victims of sexual abuse. Coppola reviewed Ron-Priola's medical reports and testified, consistent with the testimony of Ron-Priola, that there were no physical signs of sexual abuse of either J or B. He further testified that, with children as young as J and B, whose hymens are nonestrogenized, he would expect to see scarring or lesions from any trauma or injury to the vaginal openings. He also agreed that he would expect to see "some kind of lesion . . . scarring . . . fissures [or] things of that nature" in the rectal area had there been forced penetration. Coppola stated that "[y]ou can see scars on the . . . anus very easily" and that, even "if something had time to heal . . . you should [still] be able to see it . . . ."

The defense next presented the testimony of James Oulundsen, a private investigator with Iris, LLC, a company that specializes in digital forensics. Oulundsen testified that, shortly before trial, he went to the Dan-

State *v.* Juan A. G.-P.

bury Police Department to examine the family's iPad but found the device to be "locked," which happens when someone repeatedly attempts to unlock it with an incorrect passcode. Subsequently, the trial court granted the defendant's request to have the iPad examined by Cellebrite, a company that specializes in electronic data recovery. Cellebrite was able to unlock the iPad and to extract more than 9900 pages of data from it. Oulundsen testified that the browsing history revealed that someone had used the iPad to access pornographic websites on multiple occasions between March, 2015, and January, 2016, a period of time when the defendant was no longer living with the family. No data was recovered from the period when the defendant was alleged to have used the device.

The defense also presented the expert testimony of Nancy Eiswirth, a clinical psychologist with experience conducting forensic interviews for the Department of Children and Families. Eiswirth explained to the jury the concepts of suggestibility and reinforcement as they relate to forensic interviews, noting in particular that the younger and less intelligent a child is, the more suggestible he or she tends to be. Eiswirth further testified that how the interviewer responds to a child's answers can affect the accuracy of the information obtained from the child. By way of example, Eiswirth stated that, if the child answers "no" to a particular question and the interviewer answers, "no . . . [in the form of] a question, then . . . the child may then [think that they] did . . . not get [the answer] right . . . ." Eiswirth explained that "[interviewers] have to be very careful about inflections and . . . reinforcing certain types of information over other types of information. You don't want to reinforce [the child when she says] yes, he touched me, but . . . when the child says no, he didn't touch me, ignore that [answer]."

State *v.* Juan A. G.-P.

During her closing argument, the prosecutor argued that the jury could find the defendant guilty solely on the basis of J's and B's testimony, stating: "The testimony of each of these children alone is enough to convict. The testimony of each of these children alone is direct evidence of child sexual abuse. The testimony of these two kids together is overwhelming. . . . If you find these kids credible, then [the state] ask[s] for a verdict of guilty on all counts . . . ."

During his closing argument, defense counsel argued that inconsistences in J's and B's statements—to Meyer and Ron-Priola and at trial—should create reasonable doubt as to the defendant's guilt. He also asked the jury to scrutinize "how the forensic interviews were conducted. Were leading questions used during the interviews? Were [some] answers . . . reinforced while other bad answers were not?" To explain "how . . . two nine year olds [could] make this up" or "become sexualized to know the things that they [talked about]," defense counsel asserted that it was clear that someone in the family had used the iPad to visit pornographic websites between March, 2015, and January, 2016, a period of time when the defendant no longer lived with the family, and when C claimed the device did not work. He also questioned why, if C believed that the defendant had used the iPad to show J and B pornographic videos, she "reset the [device] and remove[d] that evidence [from it] before turning it over to the police . . . ." Finally, defense counsel argued the inherent unlikelihood that the defendant would sexually abuse his stepdaughter and stepniece "while his wife was in the shower only steps away . . . ." Defense counsel also questioned why B "would . . . continue to go over [to J's house] for sleepovers . . . after [the defendant] had [done] what [is] claimed to have occurred . . . ."

State *v.* Juan A. G.-P.

During her rebuttal argument, the prosecutor argued that the defendant had presented no evidence that it was C or any of her children who had used the iPad to visit the pornographic websites between March, 2015, and January, 2016. She further argued that the strength of the state's case was underscored by the "idiosyncratic details" J and B had provided about the sexual abuse, details she argued J and B could not have made up given their ages, including J's memory of the defendant's telling her that he used saliva to get his penis hard, and B's recollection of "holding hands while the abuse happen[ed] . . . ." Finally, the prosecutor argued that, although Ron-Priola testified that the fusion on J's labia minora was a normal variant in girls her age, she also testified that it could have been caused by a prior irritation or by a penis rubbing against it.

The jury subsequently found the defendant guilty on all counts. The trial court sentenced the defendant to concurrent twenty-five year terms of imprisonment on the aggravated sexual assault of a minor counts and consecutive four year terms of imprisonment on each of the remaining risk of injury to a child counts, for a total effective sentence of thirty-three years of imprisonment.

I

We begin with the defendant's request, which the state does not oppose, that we review J's and B's psychiatric records to determine whether the trial court correctly determined that they contain no exculpatory or relevant impeachment material. The following facts are relevant to our resolution of this issue. Before trial, the defendant filed a motion seeking an in camera review of J's and B's psychiatric records. The state thereafter subpoenaed the records from Family and Children's Aid, and the records were then turned over to the children's guardian ad litem, Attorney Rebecca Mayo Good-

State *v.* Juan A. G.-P.

rich. At a hearing on the defendant's motion, Goodrich indicated that she had reviewed the records and was not opposed to the court's review of them in camera. She further indicated that the records for J went back to mid-2012, whereas the records for B were more recent, beginning in 2015. Finally, she apprised the court that, although J's records were more voluminous, three quarters of them concerned "an issue that ha[d] nothing to do with this criminal proceeding."

After the state rested its case, the court informed the parties that it had reviewed J's psychiatric records and "found that there was absolutely no exculpatory information that would be of value to anybody. In fact, [if] the court had to pass judgment on the documents it reviewed, there were probably more passages that were quite inculpatory rather than exculpatory, [of] which there [was] none." The court further stated that it had not reviewed B's records because none was provided. After the trial, the defendant filed a motion for rectification of the record, which the trial court granted, and the psychiatric records related to J (three envelopes) were marked as court exhibit VI and the records related to B (one envelope) were marked as court exhibit VII. At that time, the court clarified for the record that, contrary to what it had stated at trial, the court had reviewed B's records but did not realize it had done so at the time because they were mixed in with J's records. The court further stated that it had found no exculpatory evidence in B's records.

The following principles guide our analysis of this issue. "The need to balance a witness' statutory privilege to keep psychiatric records confidential against a defendant's rights under the confrontation clause is well recognized. . . . The test and the associated burdens imposed on a defendant are equally well chronicled. If, for the purposes of cross-examination, a defendant believes that certain privileged records would disclose

information especially probative of a witness' ability to comprehend, know or correctly relate the truth, he may, out of the jury's presence, attempt to make a preliminary showing that there is a reasonable ground to believe that the failure to produce the records would likely impair his right to impeach the witness. . . . If in the trial court's judgment the defendant successfully makes this showing, the state must then obtain the witness' permission for the court to inspect the records in camera. A witness' refusal to consent to such an in camera inspection entitles the defendant to have the witness' testimony stricken. . . .

"Upon inspecting the records in camera, the trial court must determine whether the records are especially probative of the witness' capacity to relate the truth or to observe, recollect and narrate relevant occurrences. . . . If the court determines that the records are probative, the state must obtain the witness' further waiver of his privilege concerning the relevant portions of the records for release to the defendant, or have the witness' testimony stricken. If the court discovers no probative and impeaching material, the entire record of the proceeding must be sealed and preserved for possible appellate review. . . . Once the trial court has made its inspection, the court's determination of a defendant's access to the witness' records lies in the court's sound discretion, which we will not disturb unless abused. . . .

"Access to confidential records should be left to the discretion of the trial court which is better able to assess the probative value of such evidence as it relates to the particular case before it . . . and to weigh that value against the interest in confidentiality of the records. . . . [T]he linchpin of the determination of the defendant's access to the records is whether they sufficiently disclose material especially probative of the ability to comprehend, know and correctly relate the truth . . .

State *v.* Juan A. G.-P.

so as to justify breach of their confidentiality and disclosing them to the defendant in order to protect his right of confrontation.'' (Citations omitted; footnotes omitted; internal quotation marks omitted.) *State* v. *Slimskey*, 257 Conn. 842, 855–57, 779 A.2d 723 (2001).

Having reviewed the psychiatric records in question, we conclude that the defendant was denied access to information probative of J's and B's ability to know and relate the truth with respect to the events in question. With respect to J, the information relates to behavioral, cognitive, and emotional issues that could affect her ability to observe, understand, and accurately narrate the events in question. J's records also indicate the existence of a conflict between J and C regarding each other's reporting of these events. With respect to B, the information concerns mental health and behavioral issues, as well as a history of untruthfulness.

One other aspect of J's psychiatric records is noteworthy in this context. As the guardian ad litem indicated, J's psychiatric records predate the disclosures of abuse in this case by nearly three years and, thus, include a period of time during which the alleged abuse was occurring but had not yet been disclosed. The absence of any report of abuse to the treating psychiatrist during that period may require disclosure to the defense because, depending on the facts of a case, what is not contained in such records may be as probative as what is contained in them. Furthermore, any reference or information pertaining to the defendant is necessarily relevant insofar as it may serve to elucidate the victims' relationship with the defendant prior to the disclosures.

Finally, we observe that even inculpatory material contained in psychiatric records is relevant information and should be turned over to the defense. This is so because the inculpatory information may differ from

State *v.* Juan A. G.-P.

the evidence presented at trial, or be inconsistent with the victims' other statements, thereby calling into question the reliability of the state's version of events.

"Although the confrontation right is not absolute and is subject to reasonable limitation . . . there is, nevertheless, a minimum level of cross-examination that must be afforded to the defendant into matters affecting the reliability and credibility of the state's witnesses." (Citation omitted.) Id., 858. In the present case, the defendant was denied access to information compiled by trained professionals that was relevant to and probative of J's and B's ability to know and relate the truth. When this type of information is withheld from the defense in a case that depends on the credibility and reliability of the victims' version of events, the failure to disclose it is not harmless error.

We have explained that "[t]he correct inquiry for identifying harmless constitutional error is to ask whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt. . . . Whether such error is harmless in a particular case depends [on] a number of factors, such as the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." (Internal quotation marks omitted.) Id., 859.

J's and B's testimony was extremely important to the outcome of this case. As the prosecutor argued during closing argument: "The testimony of each of these children alone is enough to convict. . . . The testimony of these two kids together is overwhelming. . . . If you

State *v.* Juan A. G.-P.

find these kids credible, then [the state] ask[s] for a verdict of guilty on all counts . . . .'' J's and B's testimony was not cumulative of other evidence. There was an absence of corroborating evidence due to C's erasure of the data from the family's iPad, and, as previously indicated, there was no physical evidence of abuse.

In its appellate brief, the state argues that ''the nearly forty minute [forensic] interviews of each child, disclosing consistent, detailed accounts [of the defendant's abuse] with manifest sincerity,'' was compelling evidence of the defendant's guilt. The state further argues that this evidence was strengthened by ''[t]he idiosyncratic details [J and B] related in response to follow-up questions [such as] the defendant's use of saliva to harden his penis, the girls' holding hands out of fear while being penetrated, [and B's] kneeling in a position she knew from prayer . . . .''

We agree with the state that the forensic interviews were the strongest evidence given that they were conducted in close temporal proximity to the events in question. We have studied them carefully—both the video recordings and the written transcripts—and disagree that they present ''consistent, detailed accounts'' of those events. The answers each child gave to Meyer's questions were generally vague and nonresponsive. Although we agree that idiosyncratic details given by a child about sexual abuse can be a strong indicator that the child actually experienced what he or she is describing, we find it significant that one of the idiosyncratic details alluded to by the state—that the defendant put his penis inside J's and B's anus and vagina in the dining room while each girl stood (J) or knelt (B) on a chair, holding hands—was not mentioned in any of J's accounts of the assaults.

As for the defendant's putting saliva on his penis, J disclosed this information when Meyer asked her, ''[d]id

State *v.* Juan A. G.-P.

he ever do anything to his thing?'' J initially replied
''[n]o.'' When Meyer responded, ''[n]o?,'' J stated, ''[o]h!
Yea, yea, yea, he would get his saliva like this and then
put it on . . . [h]is thing. . . . And he said it felt good
. . . and he said it . . . would be hard . . . .'' Later,
however, when Meyer asked J to tell her more about
the saliva incident, J replied that it had not really hap-
pened and that it was just something the defendant had
told her about.

Contrary to the state's assertion, we do not believe
that the only way J could have known about a man
putting saliva on his penis is if the defendant told her
about it. The evidence established that the family's iPad
was accessible to all members of the household and
was used to access pornographic websites, even after
the defendant no longer lived in the home.

In light of the foregoing, we cannot conclude that the
trial court's failure to turn over J's and B's psychiatric
records was harmless error. The defendant is entitled
to a new trial at which, if a waiver is obtained from J
and B, defense counsel would be permitted to review
the impeachment and other relevant information con-
tained in their psychiatric records and to use that infor-
mation in his cross-examination of the witnesses.

II

Because the issue is likely to arise again at a new
trial, we next address the defendant's claim that the
trial court deprived him of his right to confrontation
by preventing him from questioning C and D about their
U visa applications. Before addressing the merits of this
claim, it is important to understand the U visa program
and how it works.

''Congress created the [U visa] through the passage
of the Victims of Trafficking and Violence Protection
Act of 2000 . . . 8 U.S.C. § 1101 (a) (15) (U) [2012].

State *v.* Juan A. G.-P.

The [a]ct created a new nonimmigrant visa classification that permits [undocumented] immigrants who are victims of serious crimes and who assist law enforcement to apply for and receive a nonimmigrant visa called a [U visa]. . . . The [U visa] provides legal status to petitioners and qualifying family members to apply for work authorization and [to] remain in the United States." (Citations omitted.) *Calderon-Ramirez* v. *McCament*, 877 F.3d 272, 274 (7th Cir. 2017). "The U visa program [which is administered by United States Citizenship and Immigration Services (USCIS), a division of the United States Department of Homeland Security (DHS)] is intended to strengthen the ability of law enforcement agencies to detect, investigate, and prosecute [certain crimes] . . . against [undocumented immigrants], while offering protection to victims of such offenses . . . .

"To be eligible for a U visa, a petitioner must establish that he or she: (1) has suffered substantial physical or mental abuse as a result of having been a victim of qualifying criminal activity; (2) possesses information about qualifying criminal activity; and (3) has been helpful, is being helpful, or is likely to be helpful to an authority investigating or prosecuting qualifying criminal activity. 8 U.S.C. § 1101 (a) (15) (U) (i) [2018]." (Citations omitted; internal quotation marks omitted.) *Perez Perez* v. *Wolf*, 943 F.3d 853, 856–57 (9th Cir. 2019). As a practical matter, a petitioner applies for a U visa by filing a federal Form I-918 with USCIS. See 8 C.F.R. § 214.14 (c) (1) (2022) ("USCIS has sole jurisdiction over all petitions for U nonimmigrant status"). If the USCIS determines that the petitioner meets the eligibility criteria, it "will approve [the] Form I-918." Id., § 214.14 (c) (5) (i); see also *Gonzalez* v. *Cuccinelli*, 985 F.3d 357, 363 (4th Cir. 2021) ("[w]hen a petitioning [undocumented immigrant] has satisfied the statutory criteria (and complied with the requisite procedures),

State *v.* Juan A. G.-P.

the agency has committed to approve the [U visa] petition and [to] grant a [U visa] (along with the immigration protections and work authorization) subject to the annual statutory cap set by Congress'').

"[U visa] status carries with it important benefits, including protections against deportation[9] and work authorization. [Because] Congress capped the number of [U visas] at 10,000 per year—meaning not all eligible [U visa] applications can be approved . . . [USCIS] created a waiting list for applicants whose applications have been approved and who would have been granted a [U visa] but for the statutory cap. Once on this waiting list, the [undocumented immigrant] is provided [deferred action] status and may be granted work authorization." (Emphasis omitted; footnote added; internal quotation marks omitted.) *Gonzalez* v. *Cuccinelli*, supra, 985 F.3d 361. Thus, "if USCIS decides that the principal petitioner qualifies for a [U visa] but cannot be granted the visa solely because of the [10,000 person] cap, USCIS approves the application and the applicant 'must be placed on [the] waiting list' per DHS regulations. [See] 8 C.F.R. § 214.14 (d) (2) [2021]. When a principal petitioner is placed on the [waiting list], they and their qualifying family members 'will' be accorded [deferred action] status, and USCIS maintains 'discretion' to grant them work authorization."[10] *Barrios Garcia* v. *United*

---

[9] "For a petitioner who is subject to an order of exclusion, deportation, or removal issued by the Secretary [of Homeland Security], the order will be deemed canceled by operation of law as of the date of USCIS' approval of Form I-918." 8 C.F.R. § 214.14 (c) (5) (i) (2022).

[10] We note that "[c]ertifying officials may sign [a] Form I-918B for a noncitizen family member as the indirect victim regardless of whether the direct victim is a [United States] citizen or a noncitizen (such as a noncitizen parent of a [United States] citizen child who is the direct victim)." Dept. of Homeland Security, U Visa Law Enforcement Resource Guide (2022) p. 7, available at https://www.dhs.gov/sites/default/files/2022-05/U-Visa-Law-Enforcement-Resource-Guide-2022_1.pdf (last visited January 31, 2023). We further note that the Department of Children and Families (department) requires that clients be informed of their eligibility for a U visa and offered assistance in applying for one. See 2 Dept. of Children & Families, Policy Manual

*States Dept. of Homeland Security*, 25 F.4th 430, 437 (6th Cir. 2022). "[D]eferred action status means that . . . no action will thereafter be taken to proceed against an apparently deportable [undocumented immigrant] . . . ." (Emphasis omitted; internal quotation marks omitted.) *Texas* v. *United States*, 809 F.3d 134, 167 (5th Cir. 2015), aff'd, 579 U.S. 547, 136 S. Ct. 2271, 195 L. Ed. 2d 638 (2016). "As of [2021], there were 161,708 pending [U visa] applications and 108,366 pending derivative petitions." *Barrios Garcia* v. *United States Dept. of Homeland Security*, supra, 436; see id., 436–37 (describing "deluge" of U visa applications and efforts to accommodate them). "An individual can apply for lawful permanent resident status once [he or she has] possessed a [U visa] for three years. See 8 U.S.C. § 1255 (m) [2012]; see also 8 C.F.R. § 245.24 (a) (1) [2017]." *Taylor* v. *McCament*, 875 F.3d 849, 851 (7th Cir. 2017). With this background in mind, we turn to the defendant's claim that the trial court violated his right to confrontation by preventing him from cross-examining C and D about their U visa applications.

The following additional facts and procedural history are relevant to our resolution of this claim. Prior to trial, the defendant filed a motion for discovery, in which he requested that the state be required to turn over "copies of all applications and other reports and records pertaining to the [U visa] applications . . . [of C and D]." The defendant argued that he needed these documents

(effective January 2, 2019) § 21-13, available at https://portal.ct.gov/-/media/DCF/Policy/Chapters/21-13.pdf (last visited January 31, 2023) ("The [s]ocial [w]orker shall assist undocumented adult clients with issues related to their immigration status. . . . If the [s]ocial [w]orker believes that an adult or child client may qualify for a U visa as a victim of domestic violence or other specific crime identified by the federal government, the [s]ocial [w]orker shall consult with the [department] [a]rea [o]ffice [a]ttorney. The [s]ocial [w]orker shall forward the request to the . . . designee [of the Commissioner of Children and Families] for certification of the federal form [I-918B]."

State *v.* Juan A. G.-P.

for effective cross-examination of C and D. At a hearing on the motion, the prosecutor informed the court that the state was not in possession of the requested documents. Specifically, she stated that the witnesses' U visa applications were "not . . . done through the state's attorney's office. It's not something that we participated in, cooperated in, or asked to participate or cooperate in." The prosecutor agreed, however, "that it's something that the defense can cross-examine on [at trial]." As for the documents themselves, however, the prosecutor stated that the defense would have to request them from the federal government. At the conclusion of the hearing, the court denied the defendant's motion, stating that it could not compel the state to turn over something it did not have.

During the trial, the defendant filed a motion in limine, requesting permission to engage in "comprehensive cross-examination" of both C and D with respect to their U visa applications. The motion stated that, "through investigations in preparation of trial, [the defense] received information from parties with knowledge that [C] and [D] met the requirements of eligibility for a [U visa] at the time of the complaint leading to the defendant's arrest on March 18, 2015. This information was supported by the investigations [of] the public defender's investigator leading . . . [defense counsel] to believe that [C] and [D] may be supporting false allegations against the defendant in the hopes of securing [U visas]. In order to obtain a [U visa], [C] and [D] must cooperate with the state's prosecution of the defendant." The motion further stated that, during the initial cross-examination of D, "[defense counsel] attempted to lay [a] foundation to develop this line of questioning [with] respect to the witness' knowledge and eligibility for a [U visa]. The [prosecutor] raised an objection as to relevance. The court called for a recess to discuss the legal issues before defense counsel would

State *v.* Juan A. G.-P.

be permitted to continue cross-examination [with] respect to the witness' interests. Due to the time of day, the court excused the jury for the day, and the witness was permitted to step down from the [witness] stand to retake [it] on the following day.''

The motion concluded that ''[the defendant] drafted this motion in limine in the interim to support [defense counsel's] desire to continue cross-examination along these lines. . . . The intent of engaging in this line of question[ing] is not for the truth of the matter but, rather, to show the jury that both witnesses have an interest in the outcome of the case in addition to their interests as [the witnesses'] mothers . . . . The defendant has the right to confront the state's witnesses [with] respect to these interests.''

Contrary to the position she had taken before trial that the defendant could cross-examine C and D on the issue, the prosecutor opposed the defendant's motion, arguing that the defendant had failed ''to set forth a foundation for the requested cross-examination.'' Specifically, the prosecutor argued that there was no evidence that C and D ever discussed J's and B's testimony with them or encouraged them to testify falsely. The prosecutor further argued that the entire line of questioning was irrelevant in the absence of evidence that C and D were aware of the U visa program prior to J's and B's disclosures.

The next day, outside the presence of the jury, the trial court allowed defense counsel to question D about her U visa application. Defense counsel began by stating, ''[i]n this case, [B] is considered to be the victim of a crime, correct?'' D responded, ''[y]es. The whole family [is].'' Defense counsel then asked D whether she was ''aware that there [is] a program for . . . family members of [crime victims] that . . . enable[s] them to become citizens of the United States . . . .'' D

State *v.* Juan A. G.-P.

responded, "I learned through the Women's Center [of Greater Danbury (women's center)] that there is a program that protects families like us." When asked when she learned about the program, D responded, "[m]uch later after I started therapy . . . at the women's center. . . . I think I was in therapy for a long time when [the therapist] told me that there was a visa that would protect family members that suffered abuse." When asked whether she had applied for a U visa, D replied, "my lawyer . . . [is] doing it. The papers are with her. . . . I want to protect [B]. She needs me here. I don't want to leave this country."

After D finished testifying, the court denied the defendant's motion with respect to D, stating that it "found credible and unchallenged" D's testimony that she learned about the U visa program through the women's center and that "it was [an attorney affiliated with the women's center] that prompted her to [apply for the program] . . . some years after the reported criminal event . . . . In the court's view, that defeats almost entirely any claim that this witness had an improper intent or . . . interest in the outcome of the case [or] any measurable motivation to fabricate anything [including] her testimony. . . . As a result, there will be no questions asked of this witness with respect to her [immigration] status or . . . the [U visa] program."

Defense counsel later questioned C about her U visa application, again, outside of the jury's presence. Like D, C testified that she learned about the U visa program "after [her] family had gone through everything" and that it "was people that were working with [her] . . . that told [her] about the [U visa]." When asked whether she had applied for a U visa, C responded, "[d]o I need to answer that?" When told that she must, C stated that she had applied but could not remember when. When asked whether she ever spoke to anyone from the Danbury Police Department about applying for a U visa, C

State *v.* Juan A. G.-P.

responded that she had but that she could not remember when she had those discussions. When asked whether anyone beside her attorney had ever shared information with her about the U visa program, or assisted her in applying for a visa, C responded, "[y]es. . . . Friends and the people who are working with me . . . throughout the case who wanted to help me."

After C finished testifying, the court ruled: "Much like the other individual who testified earlier today, the [U visa] was brought to this witness' attention through folks, some of [whom are] involved in the women's center . . . . As a result, the court finds that . . . the [U visa] . . . was not an incentive [for this witness] to report the crime . . . ." The court further stated that it found "no nexus" between C's U visa application "and any possible interest [in] the outcome of the case," and, further, that C "lack[ed] any improper intent or . . . motivation to fabricate [her testimony]." Thus, the court did not allow defense counsel "to ask in front of the jury any questions regarding [C's] status . . . in the United States or in connection with any [U visa] application."

On appeal, the defendant argues that the trial court's rulings deprived him of his constitutional right to confrontation and to have the jury decide questions related to C's and D's credibility. The defendant contends that the trial court's rulings were "especially egregious" because the evidence established that C and D had applied for U visas, and "the state had previously acknowledged that this was an area that the defendant could cross-examine [them] about." The defendant argues that the rulings were harmful because they prevented him from presenting to the jury a plausible theory as to why C and D would falsely implicate him in the alleged crimes, and why they would manipulate their children to do so.

The state responds that the trial court properly exercised its discretion in excluding the proffered testi-

State *v.* Juan A. G.-P.

mony. Specifically, the state argues that the trial court simply "fulfilled its gatekeeping function" when it prohibited the requested cross-examinations due to defense counsel's "[failure] to establish a foundation to connect the [U visa] applications to a motive to fabricate." The state argues that, in the absence of any "temporal and logical connection between the . . . applications and a motive to fabricate," the trial court correctly determined that the applications were irrelevant to C's and D's credibility. The state contends that "[t]here was no evidence that [C and D] knew about the [U visa] program before their daughters revealed the abuse to [the] police, a forensic interviewer, and a doctor. What [they] did not know on February 12, 2015, could not have given them a motive to fabricate [the] revelations that occurred on that date and [in their] immediate aftermath."

The following principles guide our analysis of this claim. "The right of confrontation is the right of an accused in a criminal prosecution to confront the witnesses against him. . . . The primary interest secured by confrontation is the right to cross-examination . . . and an important function of cross-examination is the exposure of a witness' motivation in testifying. . . . Cross-examination to elicit facts tending to show motive, interest, bias and prejudice is a matter of right and may not be unduly restricted." (Internal quotation marks omitted.) *State* v. *Wright*, 320 Conn. 781, 817–18, 135 A.3d 1 (2016). "The right of confrontation is preserved if defense counsel is permitted to expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness. . . .

"Although it is within the trial court's discretion to determine the extent of cross-examination and the admissibility of evidence, the preclusion of sufficient inquiry into a particular matter tending to show motive, bias and interest may result in a violation of the constitu-

State *v.* Juan A. G.-P.

tional requirements . . . of the sixth amendment.''
(Internal quotation marks omitted.) Id., 818. This court
has held repeatedly that "[e]vidence tending to show
the motive, bias or interest of an important witness is
never collateral or irrelevant. It may be . . . the very
key to an intelligent appraisal of the testimony of the
[witness].'' (Internal quotation marks omitted.) *State* v.
*Jose G.*, 290 Conn. 331, 345 n.11, 963 A.2d 42 (2009);
see also *State* v. *Jordan*, 305 Conn. 1, 27, 44 A.3d 794
(2012) ("inquiry into prototypical forms of bias is by its
very nature relevant to a witness' testimony" (internal
quotation marks omitted)). "The range of matters
potentially giving rise to bias, prejudice or interest is
virtually endless." Conn. Code Evid. § 6-5, commentary.

"[A] criminal defendant states a violation of the [c]on-
frontation [c]lause by showing that he was prohibited
from engaging in otherwise appropriate cross-examina-
tion designed to show a prototypical form of bias on
the part of the witness . . . .'' *Delaware* v. *Van Arsdall*,
475 U.S. 673, 680, 106 S. Ct. 1431, 89 L. Ed. 2d 674
(1986). "[W]hether . . . limitations on impeachment,
including cross-examination, [were] so severe as to vio-
late [the defendant's rights under] the confrontation
clause . . . is a question of law [that is] reviewed de
novo." (Citation omitted; internal quotation marks omit-
ted.) *State* v. *Davis*, 298 Conn. 1, 11, 1 A.3d 76 (2010).

It bears emphasis that, although restrictions on the
scope of cross-examination are within the trial court's
sound discretion, "this discretion comes into play only
*after* the defendant has been permitted cross-examina-
tion sufficient to satisfy the sixth amendment." (Empha-
sis added; internal quotation marks omitted.) *State* v.
*Leconte*, 320 Conn. 500, 511, 131 A.3d 1132 (2016); see
also *State* v. *Santiago*, 224 Conn. 325, 331, 618 A.2d 32
(1992) ("[a]lthough it is axiomatic that the scope of
cross-examination generally rests within the discretion
of the trial court, [t]he denial of all meaningful cross-

State *v.* Juan A. G.-P.

examination into a legitimate area of inquiry fails to comport with constitutional standards under the confrontation clause'' (internal quotation marks omitted)). "[A] claim that the trial court unduly restricted cross-examination generally involves a two-pronged analysis: whether the aforementioned constitutional standard has been met, and, if so, whether the court nonetheless abused its discretion . . . ." (Internal quotation marks omitted.) *State* v. *Leconte*, supra, 511–12. "Constitutional concerns are at their apex when the trial court restricts a defendant's ability to cross-examine a key government witness." (Internal quotation marks omitted.) *State* v. *Jordan*, supra, 305 Conn. 27.

Applying these principles, we conclude that the trial court violated the defendant's right to confrontation by prohibiting defense counsel from asking C and D any questions about their U visa applications in the presence of the jury. As a result, the defense was prevented from exposing jurors to prototypical impeachment evidence showing that a witness was promised or stood to gain some type of benefit from the government in return for his or her cooperation. See *Cazorla* v. *Koch Foods of Mississippi, LLC*, 838 F.3d 540, 559 (5th Cir. 2016) ("U visa applicants are analogous to [any witnesses who stand to gain a benefit from testifying] in criminal trials, and in that context, as one court has pithily observed, [a]ny competent lawyer would . . . [know] that . . . special immigration treatment by [law enforcement agencies] [is] highly relevant impeachment material" (internal quotation marks omitted)); *Romero-Perez* v. *Commonwealth*, 492 S.W.3d 902, 907 (Ky. App. 2016) ("The value of [U visa] status for those living in immigration limbo cannot be overstated. The ability to transform oneself from illegal immigrant, to legal visa holder, to permanent legal resident in a relatively short amount of time without ever having to leave the United States,

State *v.* Juan A. G.-P.

could provide a strong motive for fabrication or embellishment.'' (Emphasis omitted.)).

The Fifth Circuit Court of Appeals' comparison of U visas to cooperation agreements is an apt one. See *Cazorla* v. *Koch Foods of Mississippi, LLC*, supra, 838 F.3d 559. U visas are awarded only if the applicant ''has been helpful, is being helpful, or is likely to be helpful'' to a governmental agency investigating or prosecuting criminal activity. 8 U.S.C. § 1101 (a) (15) (U) (i) (III) (2018). '' 'Helpful' [in this context] means the [applicant] has been, is being, or is likely to assist law enforcement, prosecutors, judges, or other government officials in the detection, investigation, prosecution, conviction, or sentencing of the qualifying criminal activity of which he or she [or a family member] is a victim. This includes providing assistance when reasonably requested. This also includes an ongoing responsibility on the part of the [applicant] to be helpful. Those who unreasonably refuse to assist after reporting a crime will not be eligible for a U visa. The duty to remain helpful to law enforcement exists even after a U visa is granted, and those . . . who unreasonably refuse to provide assistance after the U visa has been granted will not be eligible to obtain lawful permanent residence and may have the visa revoked by USCIS.'' Dept. of Homeland Security, U and T Visa Law Enforcement Resource Guide (2016) p. 7, available at https://www.dhs.gov/sites/default/files/publications/U-and-T-Visa-Law-Enforcement-Resource%20Guide_1.4.16.pdf (last visited January 31, 2023).

In denying defense counsel's request to cross-examine C and D about their U visa statuses, the trial court reasoned that the proffered testimony was irrelevant because of C's and D's testimony that they were not aware of the U visa program prior to J's and B's disclosures. Having credited C's and D's testimony, the trial court reasoned that their desire to obtain U visas could not have been the motivating force behind their daugh-

State *v.* Juan A. G.-P.

ters' disclosures. The court therefore concluded that the defendant had failed to establish a "nexus" between C's and D's U visa applications "and any possible interest [they could have in] the outcome of the case." We agree with the defendant that the trial court should not have made findings concerning C's and D's credibility. See *State* v. *Porter*, 241 Conn. 57, 120, 698 A.2d 739 (1997) ("forming impressions and intuitions regarding witnesses is the quintessential jury function"), cert. denied, 523 U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d 645 (1998). We further conclude that the trial court's view of what was relevant in this context was too narrow.

To lay a foundation for the admission of impeachment evidence, the defendant was required to show that the evidence was relevant to the witness' motive to testify in a certain manner. See Conn. Code Evid. § 6-5 ("[t]he credibility of a witness may be impeached by evidence showing bias for, prejudice against, or interest in any person or matter that might cause the witness to testify falsely"). "Evidence is relevant if it has *any* tendency to make the existence of any fact that is material to the determination of the proceeding more probable or less probable than it would be without the evidence. . . . All that is required is that the evidence tend to support a relevant fact *even to a slight degree*, [as] long as it is not prejudicial or merely cumulative." (Emphasis in original; internal quotation marks omitted.) *State* v. *Patrick M.*, 344 Conn. 565, 600, 280 A.3d 461 (2022). We do not agree that the U visa evidence was irrelevant simply because C and D testified that they did not learn about the U visa program until after J and B had accused the defendant. It is well established that jurors are free to believe some, all, or none of a witness' testimony. See *State* v. *Padua*, 273 Conn. 138, 185, 869 A.2d 192 (2005). Even if the jury believed C's and D's testimony, it would not render the U visa evidence irrelevant. "One can readily see how the [U visa] program's requirement

State *v.* Juan A. G.-P.

of 'helpfulness' and 'assistance' by the [witness] to the prosecution could create an incentive to [witnesses] hoping to have their [U visas] granted. Even if the [witness] did not outright fabricate the allegations against the defendant, the structure of the program could cause a [witness] to embellish [his or] her testimony in the hopes of being as 'helpful' as possible to the prosecution.'' *Romero-Perez* v. *Commonwealth*, supra, 492 S.W.3d 906.

The Oregon Court of Appeals' analysis of the issue in *State* v. *Valle*, 255 Or. App. 805, 298 P.3d 1237 (2013), is fully applicable in the present case: ''[The] defendant laid a sufficient foundation for the admission of evidence that [the witness] had applied for a U visa on the ground that she had been abused. . . . [A]ll [the] defendant had to do to lay a sufficient foundation was show that the evidence was relevant, and, to do that, all he had to show was that the evidence had a tendency, however slight, to demonstrate that [the witness] had a personal interest in testifying against him. He did that. He presented information, in the form of [the witness'] own testimony, that [she] had applied for a U visa on the ground that she was a victim of abuse. From that testimony alone, a jury could infer that [the witness] had a personal interest in testifying [against the defendant]. Simply put, [the witness] had applied for an opportunity to stay in the country on the ground that she had been abused; based on that fact, a jury could reasonably infer that she had a personal interest in testifying in a manner consistent with her application for that opportunity. Thus, [the] defendant's proffered impeachment evidence was relevant, and . . . the trial court erred in excluding it.''[11] (Footnote omitted.) Id., 814–15.; see also

---

[11] In arguing to the contrary, the state relies on the principle that ''the jury may not infer the opposite of a witness' testimony solely from its disbelief of that testimony.'' *State* v. *Hart*, 221 Conn. 595, 605, 605 A.2d 1366 (1992). The state then argues that, ''[r]egardless of how the jury might assess [C's and D's] credibility, based on [the defendant's] proffer, it could not have found that [their daughters'] allegations arose from [C's and D's desire

*State* v. *Zapata-Grimaldo*, Docket No. 117,831, 2018 WL 6071478, *5 (Kan. App. November 21, 2018) (decision without published opinion, 430 P.3d 491) ("[although the victim] applied for a [U visa] well after reporting [the defendant] to law enforcement . . . a jury could conclude [that she] believed [that] she needed to testify against [him] to be helpful to the certifying agency in its investigation or prosecution against him"), review denied, Kansas Supreme Court, Docket No. 117,831 (June 24, 2019); *State* v. *Del Real-Galvez*, 270 Or. App. 224, 231, 346 P.3d 1289 (2015) ("[b]ecause [the victim's] mother had applied for an opportunity to stay in the United States on the ground that her daughter had been sexually abused and coerced, a jury could reasonably infer that [the victim], out of a desire to help her mother obtain a U visa, had a personal interest in testifying against [the] defendant"); *State* v. *Dickerson*, 973 N.W.2d 249, 259 n.4, 261 n.6 (S.D. 2022) (rejecting state's assertion that victim's U visa application was not relevant impeachment evidence because victim may not have known about U visa program prior to reporting assault).

Although this court has not previously considered the admissibility of evidence of a witness' U visa application, we have considered the admissibility of evidence of a witness' immigration status generally and

to obtain U visas] . . . ." The state's reliance on the cited principle is misplaced because it is not a rule of admissibility but one of sufficiency. See *State* v. *Hart*, supra, 605–606 ("[o]ur rule barring the inference of the opposite of testimony has been applied uniformly in both criminal and civil contexts . . . [and] is an evidentiary [rule] concerning the proper method of measuring the sufficiency of the evidence" (citations omitted)); see also *Walker* v. *New York*, 638 Fed. Appx. 29, 31 (2d Cir. 2016) ("it is hornbook law that a [party] does not carry [its] burden of proving a fact merely by having witnesses deny that fact and asking the jury to decline to believe the denials"). Evidence of C's and D's U visa applications was offered to demonstrate that C and D had a substantial stake in the outcome of the case, which bore directly on their credibility. Whether their U visa applications caused them to falsely implicate the defendant or otherwise influenced them to cooperate in the prosecution was a question for the jury.

State *v.* Juan A. G.-P.

concluded that it is a relevant subject of inquiry, so long as there is a demonstrated link between it and the witness' bias, interest, or motive for testifying in a certain manner. See *State* v. *Jordan*, supra, 305 Conn. 30–31 ("[T]he fact of noncitizenship, standing alone, does not reasonably suggest that a witness will lie. Rather, there must be some demonstrated link between a witness' immigration status and his or her propensity to testify falsely."). With very few exceptions, courts that have considered the admissibility of evidence of U visas have held that a witness' efforts to obtain one is necessarily relevant to the jury's assessment of the witness' bias, interest, or motive for testifying.[12] See, e.g., *People* v. *Anguiano*, Docket No. B304946, 2021 WL 3732619, *10 (Cal. App. August 24, 2021) ("[t]o the extent that [the witness] was made aware that her cooperation in the investigation or prosecution of certain enumerated offenses could provide an avenue [toward] permanent residence and citizenship, such knowledge would have provided a strong ulterior motive to fabricate or exaggerate any criminal charges leveled against [the defendant]"); *People* v. *Villa*, 55 Cal. App. 5th 1042, 1051, 270 Cal. Rptr. 3d 46 (2020) ("evidence of [the witness'] application for a U visa was relevant impeachment evidence"), review denied, California Supreme Court, Docket No. S265552 (January 13, 2021); *State* v. *Dickerson*, supra, 973 N.W.2d 259 ("We have not before examined whether or how a [witness'] . . . efforts to

---

[12] The state cites two cases that it argues support the trial court's determination that the U visa evidence was irrelevant because the defendant failed to proffer evidence that C and D knew about the U visa program before J's and B's disclosures. See *State* v. *Buccheri-Bianca*, 233 Ariz. 324, 328, 312 P.3d 123 (App. 2013); *Quiroz* v. *State*, Docket No. 05-16-01511-CR, 2018 WL 3387362, *2 (Tex. App. July 12, 2018). We find the cited cases unpersuasive because, in each case, the court applied the same narrow standard of relevance that the trial court applied in the present case. The cited cases are also procedurally distinguishable because neither involved a confrontation clause challenge to the trial court's evidentiary ruling. See *State* v. *Buccheri-Bianca*, supra, 328; *Quiroz* v. *State*, supra, *2.

State *v.* Juan A. G.-P.

obtain a [U visa] may be admissible to show motive to testify in a certain manner. However, multiple other appellate courts have examined the issue and have concluded that a [witness'] immigration status is relevant and admissible when such evidence has the tendency to demonstrate the [witness'] bias or motive to fabricate. While the facts of these cases are not all identical to those at issue here, the legal reasoning underlying the courts' rulings is persuasive." (Footnote omitted.)). We agree with the reasoning of these cases, which further supports the conclusion that C's and D's U visa applications were a proper subject of impeachment.

Having determined that the trial court deprived the defendant of his right to confrontation by precluding him from cross-examining C and D about their U visa applications, we normally would consider whether the exclusion of that testimony was harmless beyond a reasonable doubt. See, e.g., *State* v. *Edwards*, 334 Conn. 688, 706, 224 A.3d 504 (2020) ("[w]hen an [evidentiary] impropriety is of constitutional proportions, the state bears the burden of proving that the error was harmless beyond a reasonable doubt" (internal quotation marks omitted)). Because we already have determined that the defendant is entitled to a new trial on the basis of the trial court's failure to disclose relevant portions of J's and B's psychiatric records, it is unnecessary for us to engage in a harmless error analysis in connection with the U visa evidence.

### III

Because they are also likely to arise again at a new trial, we next consider the defendant's unpreserved claims of instructional error.

### A

We begin with the defendant's claim that the trial court improperly instructed the jury that, "[w]ith respect

State *v.* Juan A. G.-P.

to individual pieces of evidence . . . [w]hen the evidence is subject to two possible interpretations, you are not required to accept the interpretation consistent with innocence. . . . [Y]ou are also not required to accept the interpretation consistent with guilt." The defendant claims that this instruction, which was part of the trial court's instructions on "[e]vidence of intent,"[13] was not a correct statement of the law, diluted the state's burden of proof, and misled the jurors as to the meaning of reasonable doubt. The defendant further contends that the challenged instruction is nothing more than a reformulation of the "two-inference" instruction[14] that is barred by *State* v. *Griffin*, 253 Conn. 195,

___

[13] The trial court instructed the jury in relevant part: "Evidence of intent. What a person's intention was is usually a matter to be determined by inference. No person is able to testify that he or she looked into another's mind and saw therein a certain knowledge or a certain purpose or intention to do harm to another. Because direct evidence of the defendant's state of mind is rarely available, intent is generally proved by circumstantial evidence. The only way a jury can ordinarily determine what a person's intention was at any given time is by determining what the person's conduct was and what the circumstances were surrounding that . . . conduct . . . and from that infer what his or her intention was.

"To draw such an inference is the proper function of a jury, provided, of course, that the inference drawn complies with the standards for inferences as explained in connection with [the court's] instruction on circumstantial evidence. The inference is not a necessary one. You are not required to infer a particular intent from the defendant's conduct or statements, but it is an inference that you may draw if you find it is reasonable and logical. While the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt.

"With respect to individual pieces of evidence . . . [w]hen the evidence is subject to two possible interpretations, you are not required to accept the interpretation consistent with innocence. But you are also not required to accept the interpretation consistent with guilt. You are allowed to choose the interpretation that seems reasonable and logical. I again remind you that the burden of proving intent beyond a reasonable doubt is on the state."

[14] "A two-inference instruction provides that, if two conclusions reasonably can be drawn from the evidence, one of guilt and one of innocence, the jury must adopt the conclusion of innocence." (Internal quotation marks omitted.) *State* v. *Lemoine*, 256 Conn. 193, 205 n.13, 770 A.2d 491 (2001).

State *v.* Juan A. G.-P.

208–10, 749 A.2d 1192 (2000). The state responds, inter alia, that the two-inference instruction proscribed by *Griffin* was part of the trial court's instructions on reasonable doubt, which applied to inferences that could be drawn from the evidence as a whole, whereas the challenged instruction in the present case applies to inferences that can be drawn from individual pieces of evidence, and, as such, it was a proper statement of the law because the state is not required to prove such facts beyond a reasonable doubt. We conclude that the challenged instruction could potentially mislead or confuse jurors with respect to the state's burden of proof. Accordingly, our trial courts should henceforth refrain from including it in their jury charges.

In *Griffin*, the defendant challenged the trial court's instruction on reasonable doubt that, "[i]f two conclusions can reasonably be drawn from the evidence, one of innocence and one of guilt, you must adopt the one of innocence." (Internal quotation marks omitted.) *State* v. *Griffin*, supra, 253 Conn. 205. The defendant claimed that the instruction violated his right to due process by diluting the state's burden of proof. Id., 203, 205. This court disagreed, concluding that "the two-inference charge, when viewed in the context of an otherwise proper instruction on reasonable doubt, [did] not impermissibly dilute the state's burden of proof." Id., 209. We nonetheless "recognized that the United States Court of Appeals for the Second Circuit . . . had prohibited the use of such an instruction because the instruction by implication suggests that a preponderance of the evidence standard is relevant, when it is not. Moreover, the instruction does not go far enough. It instructs the jury on how to decide when the evidence of guilt or innocence is evenly balanced, but says nothing on how to decide when the inference of guilt is stronger than the inference of innocence but not strong enough to be beyond a reasonable doubt." (Internal quotation marks

State *v.* Juan A. G.-P.

omitted.) Id., 208; see *United States* v. *Khan*, 821 F.2d 90, 93 (2d Cir. 1987). Thus, we concluded that, although the instruction was not misleading when considered in the context of the charge as a whole, "standing alone, such language may mislead a jury into thinking that the [state's] burden is somehow less than proof beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Griffin*, supra, 209. We therefore exercised our "supervisory authority over the administration of justice to direct that, in the future, our trial courts refrain from using the two-inference language so as to avoid any such possible misunderstanding." (Footnotes omitted; internal quotation marks omitted.) Id., 209–10.

The state argues that the present case is distinguishable from *Griffin* because the challenged instruction was given with respect to facts that the state is not required to prove beyond a reasonable doubt. See *State* v. *Ortiz*, 343 Conn. 566, 603, 275 A.3d 578 (2022) ("[Although] the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt." (Emphasis omitted; internal quotation marks omitted.) We are not persuaded that the distinction drawn by the state is a meaningful one.

Indeed, we expressed the same concerns regarding the trial court's instruction on circumstantial evidence in *State* v. *McDonough*, 205 Conn. 352, 533 A.2d 857 (1987), cert. denied, 485 U.S. 906, 108 S. Ct. 1079, 99 L.

State *v.* Juan A. G.-P.

Ed. 2d 238 (1988), which, like the instruction in the present case, also applied to facts that the state was not required to prove beyond a reasonable doubt. In *McDonough*, the trial court had instructed the jury that "[c]ircumstantial evidence involves the offering of evidence of facts from which the jury is asked to infer the existence of and so to find proven another fact or facts. Such facts may be so found proven, but only if the jury finds: one, that the fact or facts from which the jury is asked to draw the inference has been proven by a fair preponderance of the evidence; and two, that the inference asked to be drawn is not only logical and reasonable, but is strong enough so that you can find it is more probable than not that the fact you are asked to infer is true." (Internal quotation marks omitted.) Id., 354. In concluding that the challenged instruction was improper,[15] this court stated: "Although, as an abstract proposition, it is not illogical to draw an inference if the evidence establishes that it is probable, such an instruction in a criminal case may confuse a jury with respect to inferring a particular fact essential to prove an element of the crime. . . . We have disapproved of this type of instruction because of its potential for misleading a jury concerning the state's burden to prove each element of the crime beyond a reasonable doubt." (Citations omitted.) Id., 355–56.

We believe that the instruction in the present case suffers from the same infirmities as the instructions in *McDonough* and *Griffin*. Indeed, the risk of confusion is arguably greater in the present case than it was in *Griffin* because, in *Griffin*, the jury was instructed that, if two conclusions reasonably could be drawn from the evidence, one of innocence and one of guilt, it "*must* adopt the one of innocence"; (emphasis added; internal

---

[15] Although we found the instruction in *McDonough* to be improper, we concluded that the error was harmless beyond a reasonable doubt. See *State* v. *McDonough*, supra, 205 Conn. 361–62.

State *v.* Juan A. G.-P.

quotation marks omitted) *State* v. *Griffin*, supra, 253 Conn. 205; whereas, in the present case, the jury was instructed that it was *not* required to accept the one consistent with innocence. As we explained in *McDonough*, the problem with this type of instruction is that it introduces into the jury's deliberations a standard of proof at odds with the proof beyond a reasonable doubt standard applicable to the charged offenses. See *State* v. *McDonough*, supra, 205 Conn. 355–56. Such an instruction is also inconsistent with the principle that, if jurors "can, in reason, reconcile all of the facts proved with any reasonable theory consistent with the innocence of the accused, then [they] cannot find him guilty . . . ." (Internal quotation marks omitted.) *State* v. *Lemoine*, 256 Conn. 193, 205, 770 A.2d 491 (2001).

Going forward, therefore, trial courts should refrain from instructing jurors, as the court did in the present case, that, "[w]hen the evidence is subject to two possible interpretations, you are not required to accept the interpretation consistent with innocence . . . [and] [y]ou are also not required to accept the interpretation [that is] consistent with guilt." With respect to subsidiary facts that are not subject to the proof beyond a reasonable doubt standard, it is sufficient for the trial court simply to instruct the jury that it may find such facts proven if it is reasonable and logical to do so.

B

We next address the defendant's claim that the trial court erred when it failed to instruct the jury in accordance with instruction 2.6-11 of the Connecticut model criminal jury instructions, which provides in relevant part: "The defendant is entitled to and must be given by you a separate and independent determination of whether [he or she] is guilty or not guilty as to each of the counts. Each of the counts charged is a separate crime. The state is required to prove each element in

State *v.* Juan A. G.-P.

each count beyond a reasonable doubt. Each count must be deliberated upon separately. The total number of counts charged does not add to the strength of the state's case.

"You may find that some evidence applies to more than one count in [the] information. The evidence, however, must be considered separately as to each element in each count. Each count is a separate entity.

"You must consider each count separately and return a separate verdict for each count. This means that you may reach opposite verdicts on different counts. A decision on one count does not bind your decision on another count." (Footnote omitted.) Connecticut Criminal Jury Instructions 2.6-11, available at https://jud.ct.gov/JI/Criminal/Criminal.pdf (last visited January 31, 2023). A footnote to instruction 2.6-11 further cautions that, "[w]hen charges involve different victims, the jury must also be instructed to separately consider the charges relating to each victim, and the evidence pertaining to each victim must be clearly distinguished." Id., n.1.

We have no doubt that the trial court would have instructed the jury in accordance with instruction 2.6-11 if defense counsel had requested the charge. See, e.g., *State* v. *Ortiz*, supra, 343 Conn. 594 ("a request to charge that is relevant to the issues in a case and that accurately states the applicable law must be honored" (internal quotation marks omitted)). The state does not contend otherwise. This court has recognized the importance of such an instruction in cases in which a defendant faces multiple charges of sexual misconduct relating to multiple alleged victims. See *State* v. *Ellis*, 270 Conn. 337, 379, 852 A.2d 676 (2004). Accordingly, in cases involving multiple charges, multiple victims, or both, we strongly recommend that our trial courts

346 Conn. 132      FEBRUARY, 2023      181

State *v.* Juan A. G.-P.

instruct jurors in accordance with instruction 2.6-11, whether asked to do so or not.[16]

The judgment is reversed and the case is remanded for a new trial.

In this opinion the other justices concurred.

---

[16] We recognize that a trial court is not required to tailor its charge to the precise language of a request to charge or model jury instruction. "If a . . . charge is in substance given, the [trial] court's failure to give [the] charge in exact conformance with the words of the request [or the model instruction] will not constitute a ground for reversal." (Internal quotation marks omitted.) *State* v. *Ortiz*, supra, 343 Conn. 594–95.