******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* LAZARO C.-D.*
## (SC 20951)

Mullins, C. J., and McDonald, D'Auria,
Ecker, Dannehy and Bright, Js.

*Syllabus*

Convicted of sexual assault in the first degree and risk of injury to a child in connection with the sexual abuse of the five year old victim, the defendant appealed to this court. He claimed, inter alia, that the trial court improperly denied his motion to suppress certain statements that he had made to two detectives during an interview at the police station, contending that he was in custody at the time and, therefore, that the police were required to advise him of his rights pursuant to *Miranda* v. *Arizona* (384 U.S. 436). *Held*:

The trial court properly denied the defendant's motion to suppress the statements he had made during the interview, that court having correctly determined that the defendant was not in custody for purposes of *Miranda*.

Any coercive elements of the station house interview were outweighed by other factors that led this court to conclude that a reasonable person in the defendant's position would not have believed that he was restrained to the degree associated with a formal arrest.

Specifically, the tone and tenor of the interrogation was cordial and non-threatening, the interrogation was not prolonged or hostile, the detectives did not make accusations, confront the defendant with incriminating evidence, or subject him to trickery or tactics aimed at inducing a confession, the detectives asked open-ended and nonleading questions, and the defendant went to the police station voluntarily and without police escort.

*Miranda* warnings are not required simply because an interview takes place at a police station, and the failure of the police to advise a suspect that he is free to terminate an interview does not require a finding that the suspect is in custody when the objective circumstances surrounding the interview indicate that a reasonable person in the suspect's position would understand that the meeting with the detectives is consensual.

---

\* In accordance with our policy of protecting the privacy interests of the victims of sexual abuse and the crime of risk of injury to a child, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

Moreover, in accordance with federal law; see 18 U.S.C. § 2265 (d) (3) (2024), we decline to identify any person protected or sought to be protected under a protection order, protective order, or a restraining order that was issued or applied for, or others through whom that person's identity may be ascertained.

The trial court abused its discretion in admitting into evidence certain statements about the sexual assault that the victim had made to her mother, A, under the spontaneous utterance exception to the rule against hearsay, as the state failed to establish that the victim had made the statements under the continuing influence or stress of the sexual assault, which had occurred five to six hours prior to the statements at issue.

Nevertheless, the erroneous admission of the victim's statements did not likely affect the outcome of the trial and was therefore harmless, as the statements were consistent with other overwhelming evidence that the defendant had sexually assaulted the victim, including the defendant's admissions to A and his video-recorded confession to the police that he had engaged in inappropriate sexual conduct with the victim.

The defendant was not deprived of his due process right to present a defense when the trial court imposed certain limitations on the testimony that his expert witness, an immigration attorney, could provide concerning the federal government's U visa program, which allows eligible, undocumented immigrants who are the victims of certain crimes, as well as the guardians of minor victims, to remain lawfully in the United States if they assist law enforcement in the investigation and prosecution of such crimes.

The trial court allowed defense counsel to cross-examine A at length about her application for a U visa and whether her testimony was motivated by a desire to secure a U visa and to obtain legal residency in the United States, and the permitted scope of the expert witness' testimony, which included the benefits U visas provide to applicants and the requirement that U visa applicants cooperate with law enforcement, sufficed to convey to the jury any biases or motives that might have affected A's testimony.

Moreover, given the significant latitude the court afforded the expert witness to describe the U visa process, along with the substantial other inculpatory evidence presented at trial, this court could not conclude that any additional expert testimony regarding the specific process for verifying a U visa applicant's cooperation with law enforcement would have sufficiently undermined A's credibility such that the lack of such testimony served to substantially sway the jury's verdict.

This court, upon independently reviewing certain nondisclosed, confidential documents in the personnel file of one of the detectives who was present during the defendant's police station interview, agreed with the trial court that those documents were not relevant to the detective's involvement in the defendant's case and did not require disclosure to the defense.

Argued September 24—officially released December 9, 2025

*Procedural History*

Substitute information charging the defendant with the crimes of sexual assault in the first degree and risk

of injury to a child, brought to the Superior Court in the judicial district of New Britain, where the court, *Baldini, J.*, denied in part the defendant's motion to suppress certain evidence; thereafter, the case was tried to the jury before *Baldini, J.*; verdict and judgment of guilty, from which the defendant appealed to this court. *Affirmed*.

*James B. Streeto*, senior assistant public defender, for the appellant (defendant).

*Alexander A. Kambanis*, deputy assistant state's attorney, with whom, on the brief, were *Christian M. Watson*, state's attorney, and *Robert F. Mullins*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

D'AURIA, J. The defendant, Lazaro C.-D., appeals directly to this court from his conviction, following a jury trial, of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (2) and risk of injury to a child in violation of General Statutes § 53-21 (a) (2). On appeal, the defendant claims that the trial court incorrectly (1) denied his motion to suppress statements he had made to New Britain police detectives because he was in custody at the time but had not been advised of his *Miranda*[1] rights, (2) determined that the victim's statements to her mother, A, on the evening of the sexual assault were admissible under the excited utterance exception to the rule against hearsay, and (3) limited the testimony of the defendant's expert witness regarding the verification processes applicable for U visa applications and the options a person who has

---

[1] Under *Miranda*, any statements a suspect in custody makes in response to police questioning generally will be suppressed unless, prior to the questioning, the suspect is advised that he "has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Miranda* v. *Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

overstayed a tourist visa has for remaining legally in the United States. The defendant also asks this court to review in camera nondisclosed, confidential material from the personnel file of one of the detectives who testified at the hearing on the defendant's motion to suppress for the purpose of determining whether the file contains any material that was required to be disclosed to the defense pursuant to *Giglio* v. *United States*, 405 U.S. 150, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972). We affirm the trial court's judgment.

The jury could have reasonably found the following facts. On December 31, 2018, the then five year old victim and A were staying at the apartment of A's sister in New Britain after having recently arrived in the United States from the Dominican Republic. The defendant, who was married to A's niece, lived with his wife in a studio in the back of the apartment. At about 5 p.m., while A and other family members who lived in the apartment were getting ready for a New Year's Eve party, the defendant sexually assaulted his wife's cousin, the victim, in his bedroom.

Later that evening, the victim accompanied A and other family members, including the defendant, to the New Year's Eve party. At about 10 or 11 p.m. the victim approached A at the party and told her that she had a secret and asked her not to tell anyone. She then informed A that the defendant had kissed her earlier that day. When the family returned home that evening, A and her sister questioned the victim about the incident. The victim then informed them that the defendant had kissed her neck and vagina. The next day, A confronted the defendant, who told her that the victim had climbed on top of him and seduced him. The defendant later admitted to A in a text message that he had kissed the victim.

After the family reported the incident to the New Britain Police Department, Detective David H. McDer-

mott interviewed the defendant at the police station. Because the defendant had requested a translator, Detective Francesca Bjorklund was also present to provide translation services. During the interview, the defendant confessed to inappropriate sexual conduct with the victim. At the conclusion of the interview, the detectives escorted the defendant out of the interview room, and he left the police station. An arrest warrant was later issued for the defendant, who then surrendered at the police department.

A jury found the defendant guilty of one count of sexual assault in the first degree and one count of risk of injury to a child. The trial court rendered judgment of conviction and sentenced the defendant to twenty-five years of incarceration, execution suspended after eleven years, followed by ten years of probation and lifetime sex offender registration. The defendant appealed directly to this court pursuant to General Statutes § 51-199 (b) (3).

I

The defendant first claims that the trial court incorrectly denied his pretrial motion to suppress statements he had made to the detectives during his interview at the police station because he was in custody at the time and the detectives had failed to advise him of his *Miranda* rights. We agree with the court that the defendant was not in custody at the time of the interview, and, therefore, the court properly denied his motion to suppress.

During a hearing on the motion to suppress, the trial court heard testimony from McDermott and Bjorklund, and admitted into evidence a video recording and transcript of the interview. The court made the following findings. McDermott had been assigned to investigate a sexual assault involving the victim, in which the defendant was a suspect. On February 26, 2019, McDermott

contacted the defendant by phone to request a meeting with him in connection with the investigation. The defendant spoke in English on the phone but with an accent. The defendant agreed to meet with McDermott on February 28, 2019, at the police station. On the day of the scheduled interview, the defendant phoned McDermott to request the presence of a Spanish-speaking detective at the interview. McDermott agreed to reschedule the interview to accommodate the defendant's request. Bjorklund, a Spanish-speaking detective, later phoned the defendant, who agreed to meet with the detectives on March 27, 2019.

On that day, the defendant arrived at the New Britain police station without police assistance. The defendant entered the police station through the public entrance and was escorted to an interview room where he waited alone for approximately two minutes until McDermott and Bjorklund arrived. Both detectives wore plain clothes and had on them their badges and firearms.

The interview lasted approximately fifty-six minutes. In response to open-ended questions, the defendant gave long, narrative answers without interruption from the detectives. The tone of the interview was conversational throughout. The detectives did not raise their voices, ask accusatory questions, or badger or threaten the defendant in any way. Neither detective informed the defendant, prior to or during the interview, that he was free to leave, was not under arrest, or that he could terminate the interview at any time; nor did the detectives advise him of his *Miranda* rights. At the conclusion of the interview, the detectives escorted the defendant out of the interview room, and he left the police station. The trial court denied the defendant's motion to suppress the statements he had made during the interview after concluding that the detectives were not required to read him his *Miranda* rights because he was not in custody for purposes of *Miranda*.

"To establish entitlement to *Miranda* warnings . . . the defendant must satisfy two conditions, namely, that (1) he was in custody when the statements were made, and (2) the statements were obtained in response to police questioning." *State* v. *Mangual*, 311 Conn. 182, 192, 85 A.3d 627 (2014). The parties do not dispute that the defendant's statements were obtained in response to police questioning. The legal question before us is whether the defendant was in custody during the interview, which the defendant bears the burden of proving. See, e.g., *State* v. *Jackson*, 304 Conn. 383, 417, 40 A.3d 290 (2012). "[W]e are bound to accept the factual findings of the trial court unless they are clearly erroneous, but we exercise plenary review over the ultimate issue of custody." (Internal quotation marks omitted.) *State* v. *Garrison*, 350 Conn. 61, 70, 323 A.3d 279 (2024).

Custody, for *Miranda* purposes, "is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion. In determining whether a person is in custody in this sense, the initial step is to ascertain whether, in light of the objective circumstances of the interrogation . . . a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." (Citation omitted; internal quotation marks omitted.) *Howes* v. *Fields*, 565 U.S. 499, 508–509, 132 S. Ct. 1181, 182 L. Ed. 2d 17 (2012). "Not all restraints on freedom of movement amount to custody for purposes of *Miranda*. [Accordingly, the United States Supreme Court has] decline[d] to accord talismanic power to the freedom-of-movement inquiry . . . and [has] instead asked the additional question [of] whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." (Citation omitted; internal quotation marks omitted.) *State* v. *Mangual*, supra, 311 Conn. 193. "[T]he ultimate inquiry is whether a reasonable person in the

defendant's position would believe that there was a restraint on [his] freedom of movement of the degree associated with a formal arrest. . . . Any lesser restriction on a person's freedom of action is not significant enough to implicate the core fifth amendment concerns that *Miranda* sought to address." (Citation omitted; footnote omitted; internal quotation marks omitted.) Id., 194–95.

To determine whether the defendant was in custody, a court must examine all of the circumstances surrounding the interrogation. See, e.g., *Stansbury* v. *California*, 511 U.S. 318, 322, 114 S. Ct. 1526, 128 L. Ed. 2d 293 (1994). "[T]he *Miranda* court expressed concern with protecting defendants against interrogations that take place in a police-dominated atmosphere, containing inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would otherwise not do so freely . . . [and] circumstances relating to those kinds of concerns are highly relevant on the custody issue." (Citation omitted; internal quotation marks omitted.) *State* v. *DesLaurier*, 230 Conn. 572, 577–78, 646 A.2d 108 (1994), quoting *Miranda* v. *Arizona*, 384 U.S. 436, 445, 467, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

Determining whether an individual is in custody is a "slippery" task that necessarily depends on the facts of each case. *Oregon* v. *Elstad*, 470 U.S. 298, 309, 105 S. Ct. 1285, 85 L. Ed. 2d 222 (1985). This court in *Mangual* identified a nonexclusive list of factors that our courts should consider[2] in evaluating whether a defendant is in

---

[2] In *Mangual*, the factors listed were a result of "[a] review of . . . cases from this state, as well as federal and sister state cases involving the interrogation of a suspect during a police search of his residence . . . ." *State* v. *Mangual*, supra, 311 Conn. 196. Our courts have since relied on these factors in analyzing interrogations in other contexts, including those conducted at police stations. See, e.g., *State* v. *Arias*, 322 Conn. 170, 177–78, 140 A.3d 200 (2016) (applying *Mangual* factors to interrogation at police station); see also *State* v. *Dabate*, 351 Conn. 428, 484–85, 331 A.3d 1159 (2025) (applying *Mangual* factors to interrogation in hospital setting).

custody for purposes of *Miranda*. See *State* v. *Mangual*, supra, 311 Conn. 197. They include, but are not limited to "(1) the nature, extent and duration of the questioning; (2) whether the suspect was handcuffed or otherwise physically restrained; (3) whether officers explained that the suspect was free to leave or not under arrest; (4) who initiated the encounter; (5) the location of the interview; (6) the length of the detention; (7) the number of officers in the immediate vicinity of the questioning; (8) whether the officers were armed; (9) whether the officers displayed their weapons or used force of any other kind before or during questioning; and (10) the degree to which the suspect was isolated from friends, family and the public." Id. Though useful, these factors are not an exhaustive checklist that reviewing courts should apply by rote. The weight afforded each factor, or whether the court should consider a particular factor at all, or other factors not enumerated in *Mangual*, depends on the particular context and circumstances of each case.

Our review of the record in the present case convinces us that the trial court correctly concluded that the defendant was not in custody during the March 27, 2019 interview because any coercive elements of the interview were outweighed by other factors that lead us to conclude that a reasonable person in the defendant's position would not have believed that he was restrained to the degree associated with a formal arrest.

Here, the record reveals that the tone and tenor of the interrogation was cordial and nonthreatening and was not prolonged or hostile. The interview lasted approximately fifty-six minutes, during which the detectives remained seated and maintained a calm, conversational tone. Neither of the detectives raised his or her voice or spoke to the defendant in an intimidating manner at any point prior to or after his confession. See, e.g., *State* v. *Guerrier*, 669 F.3d 1, 6 (1st Cir. 2011) ("relatively

calm and nonthreatening" nature of interaction weighed against finding of custody); *United States* v. *Chee*, 514 F.3d 1106, 1113–14 (10th Cir. 2008) (defendant was not in custody during interrogation at police station where tone of interview was "calm and conversational"). Both detectives were armed and wore visible badges, as law enforcement officers often do, but neither detective brandished a weapon, used force, or threatened the defendant, nor was either detective equipped with handcuffs. See *State* v. *Brandon*, 345 Conn. 702, 732, 287 A.3d 71 (2022) (when interrogating officers were armed, equipped with handcuffs, and wore visible badges but did not brandish weapons, use force, or handcuff defendant, defendant did not meet his burden of proving those factors weighed in favor of custody), cert. denied,     U.S.    , 143 S. Ct. 2669, 216 L. Ed. 2d 1242 (2023).

Although the detectives suspected the defendant of a serious crime, they did not make accusations or confront him with incriminating evidence, true or false; nor did they subject him to trickery or tactics to induce him to make inculpatory statements. See *State* v. *Atkinson*, 235 Conn. 748, 760–61, 670 A.2d 276 (1996) (defendant was not in custody when detectives "did not take advantage of the inherently coercive situation that an interrogation inheres" and did not "threaten or force the defendant to respond to their questions [or] trick him in any way"). After approximately thirteen minutes discussing his background, the defendant, not the detectives, first brought up the accusations against him. The detectives asked open-ended, nonleading and nonaccusatory questions. The defendant responded in long narratives without hesitation or interruption.[3] See *State* v. *Dabate*, 351 Conn. 428, 486–88, 331 A.3d 1159 (2025)

_____

[3] At one point during the interview, the defendant spoke uninterrupted for more than twenty-two minutes. Approximately halfway through this particular narrative, the defendant confessed to pulling down the victim's pants and kissing her.

(defendant was not in custody when he acquiesced to police interaction and gave every indication he wanted to share his story with police, "even pausing to clarify it to add extraneous details").

Though McDermott initiated the encounter by phoning the defendant to schedule an interview—a fact that can weigh in favor of custody; see, e.g., *United States* v. *Griffin*, 922 F.2d 1343, 1351 (8th Cir. 1990) (recognizing that "custody is more likely to exist" when encounter is initiated by law enforcement rather than by suspect)—the weight of that fact was undercut by the defendant's agreement, without objection, to meet with the detectives. See, e.g., *State* v. *Brandon*, supra, 345 Conn. 739 (police initiation of encounter was undercut by defendant's acquiescence to meeting). The defendant came to the police station voluntarily, without a police escort. Under these circumstances, in which the detectives did not order the defendant to come to the police station, and in which he had ample time to consider and decline their request, the defendant's agreement to come to the police station and sit for the interview supports the conclusion that he was not in custody. See, e.g., *Howes* v. *Fields*, supra, 565 U.S. 514 (language used to summon defendant to interview was relevant to determination of custody); *State* v. *Brandon*, supra, 740 (lack of coercion in language used to ask defendant to meet weighed against finding of custody). On the day of the originally scheduled interview, the defendant phoned McDermott to request that a translator be present during the interview. To accommodate that request, the interview was rescheduled for one month later. In *Brandon*, the defendant was told, while leaving a meeting with his probation officer, that some persons—police officers—wanted to speak with him and were waiting in another part of the building. *State* v. *Brandon*, supra, 728. In that case, this court reasoned that the defendant had the opportunity to decline the

meeting and leave but did not, which weighed against a finding of custody. See id. Unlike the defendant in *Brandon*, the defendant in the present case had one month to consider the detectives' request before he arrived for his meeting with them. See id.

The defendant argues that the location and duration of his interview—fifty-six minutes in a closed-door interrogation room at the police station with two armed detectives—together with the fact that the detectives did not explicitly advise him that he was free to leave—facts that indisputably contribute to a coercive atmosphere—necessitate a conclusion that he was in custody. We are not persuaded. The defendant's acquiescence to an interview that was free from the pressures and coercion tactics that work to undermine a suspect's free will in a police dominated atmosphere, and his ready and largely unprompted willingness to offer his narrative account of the underlying events, plainly offsets the weight of any coercive effect inherent in the station house setting.

Station house interrogations should certainly "be scrutinized with extreme care for any taint of psychological compulsion or intimidation because such pressure is most apt to exist while a defendant is interviewed at a police station." (Internal quotation marks omitted.) *United States* v. *Jacobs*, 431 F.3d 99, 105 (3d Cir. 2005); see also *Berkemer* v. *McCarty*, 468 U.S. 420, 438, 104 S. Ct. 3138, 82 L. Ed. 2d 317 (1984) ("exposure to public view . . . reduces the ability of an unscrupulous policeman to use illegitimate means to elicit self-incriminating statements"); *United States* v. *Chavira*, 614 F.3d 127, 135 (5th Cir. 2010) (interrogations in public settings are less dominated by police and reduce "the hazard that officers will resort to overbearing means to elicit incriminating responses"); *State* v. *Castillo*, 329 Conn. 311, 326, 186 A.3d 672 (2018) (interrogation is less likely to be custodial in relative comfort and familiarity of

suspect's home rather than at police station). As in the present case, station house interviews often take place behind closed doors and in secured areas where members of the public are not permitted without police permission or escort. As the defendant argues, in an unfamiliar and secure environment, a reasonable person is more likely to conclude that he or she is not free to leave without permission. Nonetheless, *Miranda* warnings are not required "simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. *Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him in custody." (Internal quotation marks omitted.) *Oregon* v. *Mathiason*, 429 U.S. 492, 495, 97 S. Ct. 711, 50 L. Ed. 2d 714 (1977); see also *State* v. *Northrop*, 213 Conn. 405, 415, 568 A.2d 439 (1990) ("[a] person, even if a suspect in a crime, is not in custody every time he is asked questions at a police station").

The defendant's argument that he was in custody rests primarily on the detectives' failure to advise him that he was free to leave. This reliance is understandable, as an advisement to that effect weighs heavily *against* a finding of custody. See, e.g., *Howes* v. *Fields*, supra, 565 U.S. 515 ("[m]ost important, [the defendant] was told at the outset of the interrogation, and was reminded again thereafter, that he could leave and go back to his cell whenever he wanted"); *United States* v. *Martinez*, 795 Fed. Appx. 367, 371 (6th Cir. 2019) ("[w]hether investigators inform a suspect that he is free to leave or to refuse to answer questions is the most important consideration in the *Miranda* custody analysis"); *State* v. *Edwards*, 299 Conn. 419, 434, 11 A.3d 116 (2011) (defendant was not in custody when he was repeatedly informed that his presence was voluntary and he was free to decline to answer questions and to leave police station at any time); *State* v. *Turner*,

267 Conn. 414, 438–39, 838 A.2d 947 (defendant was not in custody when he was told several times that he was free to leave and was not under arrest), cert. denied, 543 U.S. 809, 125 S. Ct. 36, 160 L. Ed. 2d 12 (2004); *State* v. *Northrop*, supra, 213 Conn. 415 ("[i]t is difficult to conceive of a 'reasonable man' who would not feel free to leave after having been told so many times and in so many different ways that he could").

Advising a suspect at the outset of an interrogation of what must be true for the interrogation to proceed without *Miranda* warnings—that the suspect is not under arrest and may terminate the interview at will— is "[t]he most obvious and effective means of demonstrating that a suspect has not been taken into custody . . . ." (Internal quotation marks omitted.) *State* v. *Mangual*, supra, 311 Conn. 204. An advisement to that effect provides meaningful clarity and protects the state's prospective introduction into evidence at trial of voluntary, uncoerced confessions. Indeed, the state's counsel conceded at oral argument before this court that the better practice would have been to advise the defendant that he was free to leave so as to avoid any confusion and clarify the circumstances of the encounter. Not doing so here created a closer case out of an otherwise conspicuously consensual interview.

A custody determination is more likely when an individual suspected of a crime is questioned in a police station interrogation room without an advisement that he is free to leave. The failure to advise the defendant that he was free to terminate the interview, however, does not necessitate a finding that he was in custody under the United States constitution when the objective circumstances surrounding the interview indicate that a reasonable person in his position would have understood that the meeting with the detectives was consensual. See, e.g., *State* v. *Greenfield*, 228 Conn. 62, 69–73, 634 A.2d 879 (1993). Likewise, such an advisement does

not preclude a finding of custody when the remaining circumstances of the interrogation bear the hallmarks of a formal arrest. See, e.g., *United States* v. *Newton*, 369 F.3d 659, 675–77 (2d Cir.) (defendant was in custody despite being told he was not under arrest when six law enforcement officers entered his apartment and handcuffed him), cert. denied, 543 U.S. 947, 125 S. Ct. 371, 160 L. Ed. 2d 262 (2004). In the present case, the defendant voluntarily scheduled and rescheduled his interview with the detectives and voluntarily went to the police station, where he engaged in a nonhostile, cordial interview with them.

Finally, the defendant argues that, when determining how a reasonable person in his position would perceive whether he was free to leave, we should consider the defendant's status as an immigrant from El Salvador who had little experience with our justice system. It is true that we must consider some individual characteristics of suspects when analyzing the objective circumstances of an interrogation. See, e.g., *J. D. B.* v. *North Carolina*, 564 U.S. 261, 279, 131 S. Ct. 2394, 180 L. Ed. 2d 310 (2011) ("[j]ust as police officers are competent to account for other objective circumstances that are a matter of degree such as the length of questioning or the number of officers present, so too are they competent to evaluate the effect of relative age"); *State* v. *Castillo*, supra, 329 Conn. 325 (juvenile's age must be considered in determining if suspect would reasonably believe he is in custody during interrogation).[4] At oral

_____

[4] We note that a custody analysis under the federal constitution requires "police officers and courts to examine all of the circumstances surrounding the interrogation . . . including any circumstance that would have affected how a reasonable person in the suspect's position would perceive his or her freedom to leave . . . ." (Citations omitted; internal quotation marks omitted.) *J. D. B.* v. *North Carolina*, supra, 564 U.S. 270–71 As a corollary, the court in *J. D. B.* stated that "the subjective views harbored by either the interrogating officers or the person being questioned are irrelevant. . . . The test, in other words, involves no consideration of the actual mindset of the particular suspect subjected to police questioning," as the court explained that an objective custody analysis "avoids burdening police with

argument before this court, however, the defendant's appellate counsel conceded that the record in this case does not contain any facts regarding the defendant's actual expectations or subjective understanding of the interview due to his background. As such, we cannot consider whether those factors could appropriately be an objective circumstance of the interview in this case. Accordingly, we agree with the trial court that the defendant was not in custody for purposes of *Miranda*, and his motion to suppress his statements was properly denied.

## II

The defendant next claims that the trial court abused its discretion by admitting into evidence the victim's statements to A at the New Year's Eve party under the spontaneous utterance exception to the rule against hearsay in § 8-3 (2) of the Connecticut Code of Evidence. Although we agree with the defendant that the victim's statements were inadmissible as a spontaneous utterance, we conclude that this error was not harmful.

At trial, A testified that the victim had told her at about 10 or 11 p.m. at the New Year's Eve party about the sexual assault that occurred earlier that day at about 5 or 6 p.m. In response to defense counsel's objection,

the task of anticipating the idiosyncrasies of every individual suspect and divining how those particular traits affect each person's subjective state of mind." (Citation omitted; internal quotation marks omitted.) Id., 271.

We have, however, acknowledged in various contexts that individual suspects have different backgrounds, characteristics and life experiences that will often shape their subjective perceptions of their rights when interacting with law enforcement. See, e.g., *State* v. *Castillo*, supra, 329 Conn. 325 (juvenile's age was relevant to "in custody" inquiry). The fifth amendment to the United States constitution protects all persons, and what is objectively reasonable with respect to one group of persons may be unreasonable as to another such group.

We have no need to analyze the issue further or to reach any conclusions regarding the legal viability of the defendant's argument on this issue because of the inadequacy of the record.

the state sought to admit the statements under the spontaneous utterance exception to the rule against hearsay. Defense counsel argued that the exception for spontaneous utterances requires both a temporal connection between the statements and the startling event, as well as a foundation that the statements were made under the influence of that startling event. The trial court overruled the objection, reasoning that the requirements for a spontaneous utterance were met because the declarant was a five year old victim who made the statements to A within five to six hours of the startling event.

On appeal, the defendant renews his claim that the victim's statements to A were inadmissible under the spontaneous utterance exception because the state failed to establish a foundation that the victim had made the statements under the continuing influence of the sexual assault five to six hours earlier. The state argues that the testimony was properly admitted because the five year old victim's age provided the court with greater flexibility regarding the temporal nexus requirement of the hearsay exception, as a child is unlikely to fabricate stories of sexual abuse. We review the trial court's determination to admit the statements into evidence for an abuse of discretion. See, e.g., *State* v. *Saucier*, 283 Conn. 207, 218, 926 A.2d 633 (2007).

"An out-of-court statement offered to prove the truth of the matter asserted is hearsay and is generally inadmissible unless an exception to the general rule applies. . . . Section 8-3 of the Connecticut Code of Evidence provides that certain statements are not excluded by the hearsay rule, even though the declarant is available as a witness . . . . [In particular, a] spontaneous utterance is defined as [a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." (Citation omitted; internal quotation marks omit-

ted.) *State* v. *Kirby*, 280 Conn. 361, 373, 908 A.2d 506 (2006). The exception rests on the premise that spontaneous and unreflective assertions are "trustworthy and void of self-interest or fabrication." E. Prescott, Tait's Handbook of Connecticut Evidence (6th Ed. 2019) § 8.14.2, p. 553. A hearsay statement is properly admitted as a spontaneous utterance "when (1) the declaration follows a startling occurrence, (2) the declaration refers to that occurrence, (3) the declarant observed the occurrence, and (4) the declaration is made under circumstances that negate the opportunity for deliberation and fabrication by the declarant." *State* v. *Kelly*, 256 Conn. 23, 41–42, 770 A.2d 908 (2001). It is the state's burden, as the proponent of the hearsay evidence, to establish its admissibility. See, e.g., *New England Savings Bank* v. *Bedford Realty Corp.*, 238 Conn. 745, 753, 680 A.2d 301 (1996).

The defendant does not dispute that the victim's statements followed a startling occurrence, concerned that occurrence, and that the victim observed the occurrence. The question for this court is whether the state established that the victim made the statements under the continuing stress of the sexual assault.

"The requirement that a spontaneous utterance be made under such circumstances as to [negate] the opportunity for deliberation and fabrication by the declarant . . . does not preclude the admission of statements made after a startling occurrence as long as the statement is made under the stress of that occurrence." (Internal quotation marks omitted.) *State* v. *Kelly*, supra, 256 Conn. 42. The length of time between the startling event and the statement is an important, but not dispositive, factor. See *State* v. *Stange*, 212 Conn. 612, 618, 563 A.2d 681 (1989). This court has held that "there is no identifiable discrete time interval within which an utterance becomes spontaneous" or beyond which it is no longer so. *State* v. *Kirby*, supra,

280 Conn. 375. Rather, "the application of the [spontane-ous utterance] exception entails a uniquely fact-bound inquiry. The overarching consideration is whether the declarant made the statement before he or she had the opportunity to undertake a reasoned reflection of the event . . . ." (Internal quotation marks omitted.) Id., 376.

In the present case, five to six hours had elapsed between the sexual assault of the victim and the victim's disclosure of it to A. Statements that have not followed immediately from startling events, but that this state's appellate courts have nonetheless held admissible under the spontaneous utterance exception, have not involved anything close to the significant lapse in time in this case between the startling occurrence and the victim's statement to A. Even then, when statements have followed thirty to sixty minutes after the occur-rence, our appellate courts have deemed them to be admissible only when the declarant has undergone dras-tic personal trauma and remained in a severe emotional state from the time of the event until the time of the statement. See, e.g., *State* v. *McNair*, 54 Conn. App. 807, 812–13, 738 A.2d 689, cert. denied, 251 Conn. 913, 739 A.2d 1249 (1999). In those circumstances, propo-nents of the hearsay statements must demonstrate that the declarants made the statements while still under the influence of the startling event by providing proof of their emotional or mental state at the time of the disclosure. See, e.g., *State* v. *Kirby*, supra, 280 Conn. 373 (spontaneous utterance exception applied to statement made within one-half hour of defendant arriving home from altercation where declarant was still in extremely emotional and fearful state); *State* v. *Stange*, supra, 212 Conn. 614, 620 (spontaneous utterance exception applied to statement made fifteen to thirty minutes after shooting when declarant was found covered in blood, rocking back and forth in fetal position, screaming);

*State* v. *Guess*, 44 Conn. App. 790, 793, 802–805, 692 A.2d 849 (1997) (spontaneous utterance exception applied to statement made one hour after shooting when declarant was frantic and shaking), aff'd, 244 Conn. 761, 715 A.2d 643 (1998); *State* v. *Cayouette*, 25 Conn. App. 384, 386, 388, 594 A.2d 1020 (1991) (spontaneous utterance exception applied to statements made ten to twenty minutes after assault when declarant was in " 'a kind of catatonic state' "). But see *State* v. *McNair*, supra, 813 (agitation suffered by witness "in light of the significant lapse in time between the event and the statement" (thirty minutes) did not rise to level of trauma necessary to negate opportunity for deliberation and fabrication).

The only evidence the state offered at trial regarding the victim's state of mind at the time of her statement was A's testimony that the victim was "playing, like a child would," at the New Year's Eve party prior to the disclosure.[5] The state instead relies on the young age of the victim to argue that the temporal requirement of the spontaneous utterance exception should be interpreted liberally because a child is unlikely to fabricate an incident of sexual assault, justifying the trial court's ruling because the victim made the statements under circumstances that negated the opportunity for deliberation and fabrication.[6] Regardless of the age of the

[5] Although it was not part of the state's proffer at trial in support of the spontaneous utterance, there was subsequent testimony that the victim did not interact with the defendant at the New Year's Eve party, which was unusual. This testimony, without some additional evidence connecting it to the victim's state of mind or manifestation of extreme agitation, would not, in our view, have sufficed to establish that the victim made the statements while under the continued influence of the sexual assault.

[6] In support of this argument, the state cites to *Love* v. *State*, 64 Wis. 2d 432, 219 N.W.2d 294 (1974). In *Love*, pursuant to Wisconsin's res gestae hearsay exception, which Wisconsin courts apply liberally when assertions of a young child are involved, the trial court admitted into evidence statements a child declarant made to her mother on the morning after the child was sexually assaulted. Id., 435, 441–42.

Section 8-10 of the Connecticut Code of Evidence recognizes a different hearsay exception that accommodates the legitimate interests of parties seeking to introduce, for substantive purposes, the trustworthy, nontestimo-

declarant, under the spontaneous utterance exception, the proponent of the hearsay statement must present evidence to establish that the declarant made the statement while still under the continuing stress of the startling event. Because the state offered no evidence regarding the victim's then existing emotional or mental state when she disclosed the abuse to A, it failed to establish that the victim made the statements under the continuing stress of the assault. Consequently, we conclude that the trial court improperly admitted the victim's statement to A as a spontaneous utterance.

When evidence is improperly admitted, we must determine if the admission was harmful. "When an improper evidentiary ruling is not constitutional in nature, the defendant bears the burden of demonstrating that the error was harmful." (Internal quotation marks omitted.) *State* v. *Lanier*, 347 Conn. 179, 193, 296 A.3d 770 (2023). The relevant inquiry is whether the claimed error likely affected the outcome of the trial. See, e.g., *State* v. *Kelly*, supra, 256 Conn. 39–40. We conclude that the admission of the victim's hearsay testimony was harmless in light of its minor significance relative to the substantial and consistent inculpatory evidence that was properly before the jury.

The testimony admitted as a spontaneous utterance was consistent with other overwhelming evidence at trial that the defendant had sexually assaulted the victim. Specifically, the defendant's own video-recorded confession that he engaged in inappropriate sexual con-

---

nial, out-of-court statements of young children, recognizing that child victims of abuse are less likely than adults to exclaim spontaneously or to seek timely medical treatment following incidents of abuse, often rendering unavailable exceptions such as those in § 8-3 (2) and (5) of the Connecticut Code of Evidence. See *State* v. *Maguire*, 310 Conn. 535, 574–76, 78 A.3d 828 (2013); see also Conn. Code Evid. § 8-10. In this case, the state relied on the spontaneous utterance exception in § 8-3 (2) rather than the tender years hearsay exception in § 8-10.

duct with the victim, which was played for the jury, and his admissions to A about his conduct more than suffice to assure us that the trial court's error did not likely affect the outcome of the trial. See, e.g., *State* v. *Walsh*, 52 Conn. App. 708, 720, 728 A.2d 15 ("[a] judgment need not be reversed merely because inadmissible evidence has been admitted . . . if permissible evidence to the same effect has also been placed before the jury" (internal quotation marks omitted)), cert. denied, 249 Conn. 911, 733 A.2d 233 (1999).

## III

The defendant next claims that the trial court improperly limited the testimony of his expert witness, Attorney Justin T. Conlon, an immigration lawyer, regarding the verification processes applicable to U visa[7] applications, as well as a hypothetical question regarding the options a person has to remain in the United States when that person has overstayed their tourist visa, which defense counsel attempted to offer into evidence to show that A had a motivation to fabricate testimony favorable to the state. The defendant argues that this error was harmful and deprived him of his due process right to present a defense. The state argues that the court did not abuse its discretion by placing relatively minor limitations on the scope of Conlon's testimony. We agree with the state.

The trial court allowed defense counsel to cross-examine A at length about whether A's testimony was motivated by her desire to secure a U visa and to obtain legal residency in the United States. A testified that she

---

[7] A U visa gets its moniker from subparagraph (U) of 8 U.S.C. § 1101 (a) (15), which provides nonimmigrant alien status for victims of certain crimes who do not have legal status but have suffered mental or physical abuse and are helpful to law enforcement or government officials in the investigation or prosecution of criminal activity. See 8 U.S.C. § 1101 (a) (15) (U) (i) (2024); see also *State* v. *Juan A. G.-P.*, 346 Conn. 132, 158–61, 287 A.3d 1060 (2023) (describing legal framework of U visa program under federal law).

and the victim lacked legal authorization to live in the United States and risked deportation after arriving from the Dominican Republic on a tourist visa and not departing by the required date. A stated that she learned about the U visa program during a consultation with a lawyer in the months following the sexual assault of the victim and submitted a U visa application in May, 2020. A testified about her understanding of the U visa program, acknowledging that the program provides victims of certain serious crimes, as well as the guardians of minor victims, with temporary legal protection from deportation and a pathway to permanent citizenship. A also acknowledged that a U visa applicant must cooperate with law enforcement and provide truthful testimony or risk the revocation or denial of their application. A testified that she did not understand, for U visa purposes, who verifies that her testimony in court is truthful.

To educate the jury and further impeach A, defense counsel offered expert testimony from Conlon, who was experienced in representing U visa applicants. Outside of the jury's presence, defense counsel made an extensive proffer, through Conlon, as to the testimony he would offer about the U visa program, which was largely consistent with A's understanding of the program. Conlon testified that the U visa program is for victims of qualifying crimes who cooperate with investigations by law enforcement. Minor victims of sexual assault, as well as their guardians, are eligible for the program. U visa applicants must receive certification from a law enforcement agency, or other agencies related to the criminal investigation, that the applicant has relevant information about and has reasonably cooperated with the investigation. An applicant's certification can be revoked if the victim stops cooperating with an investigation or prosecution. The U visa program provides applicants with immigration protections

while their application is pending and upon approval. If the United States Citizenship and Immigration Services (USCIS) makes an initial determination that a U visa application is bona fide, the applicant can obtain employment authorization and is generally protected from deportation while the application is pending. If a U visa application is granted, the recipient is eligible for permanent legal residency and citizenship.

Conlon proffered testimony regarding the process by which USCIS determines if a U visa applicant has in fact cooperated with law enforcement, explaining that the process may include following up with the police or the applicant's attorney. When asked how USCIS defines cooperation, Conlon responded that "there's a little bit of a gray area to it. It's, you know, it's sort of reasonable cooperation. So, it depends on the case." Conlon explained that most cases he had seen involved guilty pleas and therefore offered little time for the applicant to cooperate. Defense counsel asked Conlon what legal options a hypothetical person who had over-stayed a tourist visa would have to obtain legal immigration status. Conlon responded that overstaying a tourist visa can preclude other typical ways to obtain legal immigration status, such as employment sponsorships and student visas. Conlon explained that there are a few other options available to an individual who has overstayed a tourist visa, the most common of which include applying for asylum, marriage to a United States citizen, or obtaining legal status through the U visa program and similar programs that offer legal status to crime victims.

After hearing this extensive offer of proof, and relying on *People* v. *Hernandez*, Docket No. H040444, 2016 WL 1688338 (Cal. App. April 25, 2016), the trial court ruled that Conlon could testify about what a U visa is, the purpose of the U visa program, and the eligibility requirements, including the applicant's continued coop-

eration, along with the immigration benefits a U visa offers applicants and recipients. The court precluded Conlon from testifying further about what constitutes cooperation, how an applicant's cooperation is verified by USCIS, and the administrative process of applying for a U visa. The court reasoned that A had been cross-examined about her understanding of the process and that further testimony from Conlon did not bear on her credibility. The court also, without explanation, precluded defense counsel from asking a hypothetical question regarding options for someone who overstays a tourist visa.[8]

The jury then heard Conlon testify about the purpose, requirements and benefits of the U visa program, including the fact that an applicant's cooperation is reviewed by law enforcement.[9] On appeal, the defendant challenges the restrictions the trial court placed on Conlon's expert testimony.

"Expert testimony should be admitted when: (1) the witness has a special skill or knowledge directly applicable to a matter in issue, (2) that skill or knowledge is not common to the average person, and (3) the testimony would be helpful to the court or jury in consider-

---

[8] Although the trial court did not expound on its reasons for precluding defense counsel's hypothetical question to Conlon, on appeal, "[w]e do not presume error; the trial court's ruling is entitled to the reasonable presumption that it is correct unless the party challenging the ruling has satisfied its burden demonstrating the contrary. . . . The defendant has an obligation to supply this court with a record adequate to review his claim of error." (Citation omitted.) *State* v. *Crumpton*, 202 Conn. 224, 231, 520 A.2d 226 (1987). Specifically, if the defendant believed that the trial court precluded defense counsel's hypothetical question based on faulty reasoning, it was his responsibility to seek an articulation. See id., 232; see also Practice Book § 66-5. Without such an explanation of its reasoning, we conclude that it was within the court's sound discretion to preclude a hypothetical question that involved so many unknown variables about A's circumstances.

[9] The defendant acknowledges that the trial court's ruling barred Conlon's testimony about law enforcement's review of an applicant's required cooperation but argues that Conlon provided that testimony without objection.

ing the issues. . . . [T]o render an expert opinion the witness must be qualified to do so and there must be a factual basis for the opinion." (Internal quotation marks omitted.) *State* v. *Williams*, 317 Conn. 691, 702, 119 A.3d 1194 (2015); see also Conn. Code Evid. § 7-2.[10] "We review a trial court's decision to preclude expert testimony for an abuse of discretion." (Internal quotation marks omitted.) *State* v. *Williams*, supra, 701.

The defendant argues that the trial court's ruling prevented him from providing the jury with a complete understanding of "what pressures were on [A] to embroider or possibly fabricate testimony favorable to the state." The defendant contends that, had Conlon been permitted to explain the U visa verification process in further detail, the jury would have better understood the influences and motivations weighing on A. We are not persuaded.

The trial court permitted Conlon to testify at considerable length about the U visa program. The jury heard testimony about the U visa eligibility requirements and the benefits provided to applicants, including employment authorization, temporary protection from deportation, and a legal route to permanent citizenship. The jury also heard that victims must cooperate with law enforcement's investigation and prosecution, and that law enforcement must certify a victim's cooperation. The permitted scope of Conlon's testimony sufficed to convey to the jury any biases or motives that might affect A's testimony regarding her U visa application. Unlike the situation in *Juan A. G.-P.*, in which this court held that the trial court had violated the defen-

---

[10] Section 7-2 of the Connecticut Code of Evidence provides: "A witness qualified as an expert by knowledge, skill, experience, training, education or otherwise may testify in the form of an opinion or otherwise concerning scientific, technical or other specialized knowledge, if the testimony will assist the trier of fact in understanding the evidence or in determining a fact in issue."

dant's right to confrontation by prohibiting defense counsel from asking witnesses about their U visa applications in the jury's presence; see *State* v. *Juan A. G.-P.*, 346 Conn. 132, 168, 287 A.3d 1060 (2023); the court in the present case permitted defense counsel to cross-examine A for more than one hour about her U visa application. Given the significant latitude the court afforded the defense to have Conlon describe the U visa process, along with the substantial other inculpatory evidence in this case, we cannot conclude that any additional testimony from Conlon regarding the specific process for verifying an applicant's cooperation would have sufficiently undermined A's credibility such that the lack of such testimony " 'substantially swayed' " the jury's verdict. *State* v. *Outlaw*, 350 Conn. 251, 283, 324 A.3d 107 (2024); see, e.g., id., 283–84 (nonconstitutional error is harmless when reviewing court has fair assurance that error did not substantially affect verdict).

IV

Finally, the defendant asks this court to review[11] the nondisclosed, confidential material in Bjorklund's personnel file, which was made a court exhibit at trial. The state does not object. Bjorklund's role in this case was limited to rescheduling the defendant's interview and providing translation services during the defen-

---

[11] "It is well established that [a] criminal defendant has a constitutional right to cross-examine the state's witnesses, which may include impeaching or discrediting them by attempting to reveal to the jury the witnesses' biases, prejudices or ulterior motives, or facts bearing on the witnesses' reliability, credibility, or sense of perception. . . . Thus, in some instances, otherwise privileged records . . . must give way to a criminal defendant's constitutional right to reveal to the jury facts about a witness' mental condition that may reasonably affect that witness' credibility." (Internal quotation marks omitted.) *State* v. *Santos*, 318 Conn. 412, 424, 121 A.3d 697 (2015). On appeal, we review the records to determine if the trial court abused its discretion in concluding that the records did not contain information "especially probative of the victim's ability to know and correctly relate the truth so as to justify breaching their confidentiality in disclosing them to the defendant." (Internal quotation marks omitted.) Id., 423.

dant's interview with McDermott. Bjorklund provided testimony about that interview during the hearing on the defendant's motion to suppress. She did not testify at trial. Following the suppression hearing, the state, pursuant to General Statutes § 54-86c (b), filed a motion for an ex parte, in camera review of sealed documents pertaining to an internal affairs investigation into Bjorklund.[12] The state requested that the documents remain sealed until the trial court determined their character and whether the state had a duty to disclose any documents. The trial court reviewed the material and determined that the documents did not require disclosure. Upon our independent review of the documents, we agree with the trial court. The documents are not relevant to Bjorklund's involvement in this case, particularly in light of her limited role as a translator during the interview, which was video-recorded.

The judgment is affirmed.

In this opinion the other justices concurred.

––––––––––––––––––––

[12] Prior to trial, the state sent a letter to the interim police chief in New Britain requesting any *Giglio* material. See *Giglio* v. *United States*, supra, 405 U.S. 154–55 (due process requires that prosecution disclose evidence or information tending to discredit or impeach any government witness). The state received correspondence stating that there was nothing in Bjorklund's personnel file. The state later learned that Bjorklund was on administrative leave. Defense counsel's request for ex parte in camera review by the trial court followed.